No. 22-30179
[NO. 2:19-cr-00159-RSL, USDC, W.D. Washington]

---

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

PAIGE A. THOMPSON,

Defendant-Appellee.

---

## OPENING BRIEF OF UNITED STATES

---

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable Robert S. Lasnik
United States District Judge

---

TESSA M. GORMAN
Acting United States Attorney
Western District of Washington

TANIA M. CULBERTSON
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION ...................................................................................1

ISSUE PRESENTED ..............................................................................3

I.  The defendant committed one of the largest data breaches in United States history and caused tens of millions of dollars of loss to victim companies. Was a time-served sentence of 100 days in custody, plus five years of probation, substantively unreasonable where the district court failed to justify its 98% downward variance from the Sentencing Guidelines range and did not rationally and meaningfully consider the sentencing factors under 18 U.S.C. § 3553(a)? ...............................3

STATEMENT OF JURISDICTION........................................................3

DEFENDANT'S BAIL STATUS .............................................................4

STATEMENT OF THE CASE ................................................................4

I.  For almost half a year, Thompson works to hack into Amazon Web Services accounts, ultimately perpetrating one of the largest data breaches in U.S. history.......................................................................................4

    A.  Thompson anonymously scans millions of AWS customer accounts to identify network vulnerabilities, steal security credentials, and download customer data .........................................................6

    B.  Thompson uses victims' computing power to mine thousands of dollars of cryptocurrency.................................10

II.    Thompson "doxxes" herself to a stranger on Twitter and is caught .................................................................... 14

III.   Thompson is detained but then released on bond, and later convicted at trial of five felonies and two misdemeanors .................................................................... 16

    A.    Thompson is held in pretrial detention for three months and then released ..................................................... 16

    B.    The jury finds Thompson guilty of wire fraud and multiple counts of computer fraud ...................................... 20

IV.   The district court sentences Thompson to time served and probation .................................................................... 23

    A.    The presentence report and the parties' sentencing memoranda ..................................................... 23

    B.    The district court's comments at sentencing and its sentencing determinations.................................................. 29

    C.    Thompson's post-sentencing conduct................................... 35

SUMMARY OF ARGUMENT ....................................................... 38

ARGUMENT ....................................................................... 40

I.    Thompson's sentence is substantively unreasonable .................. 40

    A.    Standard of review .............................................................. 40

    B.    General sentencing standards .............................................. 40

    C.    Substantive reasonableness review ...................................... 41

    D.    The district court did not rationally and meaningfully consider the Section 3553(a) factors ............. 43

1. The district court failed to weigh the seriousness of Thompson's offenses ............................ 44

2. The district court failed to weigh the need for adequate deterrence ................................................ 47

3. The district court ignored evidence of Thompson's bad motives and inaccurately assessed her characteristics ........................................ 51

4. The district court did not address the need to avoid unwarranted sentencing disparities ............. 56

5. The sentence was driven by the district court's desire to spare Thompson from prison ........................................................................... 59

CONCLUSION ........................................................................ 64

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

# TABLE OF AUTHORITIES

## Federal Cases

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ........................................................ 17, 18

*Gall v. United States*,
552 U.S. 38 (2007) ................................................................... passim

*United States v. Caesar*,
10 F.4th 66 (2d Cir. 2021) ...................................................... 44, 46, 61

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) (en banc) ........................... 40, 41, 43, 57

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) ........................................................ 41, 59

*United States v. Conaster*,
514 F.3d 508 (6th Cir. 2008) ........................................................ 41, 42

*United States v. Edwards*,
595 F.3d 1004 (9th Cir. 2010) ............................................................ 42

*United States v. Martin*,
455 F.3d 1227 (11th Cir. 2006) ................................................... 48, 49

*United States v. Ressam*,
679 F.3d 1069 (9th Cir. 2012) (en banc) .................................... passim

*United States v. Saeteurn*,
504 F.3d 1175 (9th Cir. 2007) ............................................................ 56

*United States v. Sample*,
901 F.3d 1196 (10th Cir. 2018) ................................................... 48, 49

iv

*United States v. Seleznev,*
    766 F. App'x 531 (9th Cir. 2019)........................................58

*United States v. Slavin,*
    No. 21-10123, 2022 WL 576016 (9th Cir. Feb. 25, 2022)....................49

**District Court Cases**

*United States v. Muhammad Fahd,*
    No. 22:17-cr-00293-RSL, (W.D. Washington 2021).............................59

**Federal Statutes**

Title 18, United States Code,
    Section 1030(a)(2) ........................................................16, 22
    Section 1030(a)(5) ........................................................22
    Section 1343................................................................22
    Section 3231 ...............................................................3
    Section 3553(a)............................................................ passim
    Section 3553(a)(6) ........................................................56

Title 28, United States Code,
    Section 1291 ..............................................................4

**Other Authorities**

1984 United States Code Annotated,
    Section 3182..............................................................48

United States Senate Report,
    No. 98-225 (1983) ....................................................48, 49

United States Sentencing Guidelines,
    Section 3E1.1 .............................................................23

United States Sentencing Commission, Quick Facts for Theft,
    Property Destruction and Fraud Offenses (July 2022),
    https://www.ussc.gov/research/quick-facts/theft-property-
    destruction-fraud ........................................................57

United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2021, Western District of Washington* (April 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/waw21.pdf ........................................................................58

Rob McLean, *A hacker gained access to 100 million Capital One credit card applications and accounts*, CNN, July 30, 2019, https://www.cnn.com/2019/07/29/business/capital-one-data-breach/index.html ..................................................................1

Kate Conger, *Fraud and Identity Theft Trial to Test American Anti-Hacking Law*, N.Y. Times, June 8, 2022, https://www.nytimes.com/2022/06/08/technology/capital-one-hacker-trial.html ..................................................................2

*Seattle woman gets probation for massive Capital One hack*, AP News, Oct. 4, 2022, https://apnews.com/article/technology-business-seattle-sentencing-paige-thompson-6eab17de7a88d0c6a33d3f44dbfa4d2a ..................................................2

**INTRODUCTION**

In June 2022, after an eight-day trial, a jury convicted Paige Thompson of seven charges, including wire fraud and violations of the Computer Fraud and Abuse Act (CFAA). Thompson's convictions stemmed from her months-long hacking scheme in 2019. In that scheme, she repeatedly exploited a vulnerability in the cloud-computing architecture of Amazon Web Services (AWS) customers including Capital One and at least 30 other entities.

After breaching Capital One's system, Thompson downloaded the personal identifying information of over 100 million people—roughly one-third of the United States' adult population. Her hack was one of the largest data breaches in United States history. She stole data from other victims too, and mined thousands of dollars' worth of cryptocurrency using victims' computing power.

Thompson's hacking garnered extensive press coverage, both when her crimes were discovered, [1] and during her trial and sentencing

---

[1] *See, e.g.*, Rob McLean, *A hacker gained access to 100 million Capital One credit card applications and accounts*, CNN, July 30, 2019, https://www.cnn.com/2019/07/29/business/capital-one-data-breach/index.html (last visited Aug. 16, 2023).

proceedings.[2] She gained notoriety in the illegal hacking community too: Thompson's pretrial detention proceedings were referenced in the correspondence of international criminal actors under FBI investigation for a different hacking scheme.

Because of the scale of her hacking and the total loss amount attributable to her crimes, Thompson faced a Sentencing Guidelines range of 210 to 262 months of imprisonment. But the district court sentenced Thompson to time served (approximately 100 days) and five years of probation.

This remarkably low sentence—representing a 98% variance from the low end of Thompson's Guidelines range—is substantively unreasonable. The district court failed to give reasons that justified such a significant downward variance. And the sentence fails to account for the seriousness of Thompson's offenses, the harm she caused, the need to

---

[2] *See, e.g.*, Kate Conger, *Fraud and Identity Theft Trial to Test American Anti-Hacking Law*, N.Y. Times, June 8, 2022, https://www.nytimes.com/2022/06/08/technology/capital-one-hacker-trial.html (last visited Aug. 16, 2023); *Seattle woman gets probation for massive Capital One hack*, AP News, Oct. 4, 2022, https://apnews.com/article/technology-business-seattle-sentencing-paige-thompson-6eab17de7a88d0c6a33d3f44dbfa4d2a (last visited Aug. 16, 2023).

avoid unwarranted sentencing disparities, and the need to promote respect for the law and deter criminal conduct like Thompson's. Instead, the district court focused on one factor—Thompson's status as a transgender woman—to the exclusion of all others. A sentence of time served and probation for a notorious and unrepentant cybercriminal who perpetrated a data breach of this magnitude requires correction by this Court.

## ISSUE PRESENTED

I. The defendant committed one of the largest data breaches in United States history and caused tens of millions of dollars of loss to victim companies. Was a time-served sentence of 100 days in custody, plus five years of probation, substantively unreasonable where the district court failed to justify its 98% downward variance from the Sentencing Guidelines range and did not rationally and meaningfully consider the sentencing factors under 18 U.S.C. § 3553(a)?

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 and entered judgment on October 4, 2022. 1-ER-2. Thompson filed a notice of appeal on October 7, 2022. CR-389. The government filed a notice of cross-appeal on November 3, 2022. 2-ER-290. On August 10, 2023, Thompson moved to voluntarily dismiss her appeal; her motion was

granted on August 14, 2023. Dkt. Nos. 16-1, 18. This Court has jurisdiction over the government's appeal under 28 U.S.C. § 1291.

## DEFENDANT'S BAIL STATUS

Because the district court sentenced Thompson to time served on her wire-fraud count and probation on her CFAA counts, Thompson is not in custody. 1-ER-3. As a special condition of supervision, for three of her five years of probation Thompson must participate in a location-monitoring program with radio-frequency technology to ensure her compliance. 1-ER-5–6. During that period, she is "restricted to her residence at all times except for employment, religious services, medical or legal reasons, or as otherwise approved by the [United States Probation and Pretrial Services] location monitoring specialist." 1-ER-5–6. Thompson has been charged with violating her supervision. *See* 2-ER-70; pp. 36–37, *infra*.

## STATEMENT OF THE CASE

### I. For almost half a year, Thompson works to hack into Amazon Web Services accounts, ultimately perpetrating one of the largest data breaches in U.S. history

Thompson, an unemployed former Amazon System Engineer living in Seattle, spent months developing, refining, and repeating a multistep

scheme to hack AWS cloud-computing accounts. 2-ER-237; 3-ER-491; 4-ER-819. Her scheme required technological sophistication, persistence, and intentionality, as well as a customized, high-powered computing rig she built and operated out of her bedroom. 2-ER-239–40; 4-ER-697, 700–01.

AWS provides cloud-computing services to a broad variety of entities and individuals, including the victim companies in this case. 3-ER-373, 463; 4-ER-607, 625; 5-ER-866–67, 904. Cloud computing is the use of remote computer servers, known as "the cloud," rather than local computers or servers, to store, manage, and process data. 3-ER-379.

Starting in early 2019, Thompson scanned for and repeatedly exploited a vulnerability in the cloud-computing architecture of AWS customers including Capital One and at least 30 others. 2-ER-283; 4-ER-768. After breaching Capital One's system, Thompson downloaded the personal identifying information (PII) of over 100 million people. 3-ER-531. The PII she stole from Capital One included dates of birth, the complete social security numbers of over 110,000 people, and almost 80,000 bank account numbers. 2-ER-284; 3-ER-532–33. She compressed and stored this massive set of data on her computer while she researched

5

how to monetize her theft. 2-ER-282; 4-ER-764–68. She extracted from the dataset the PII of people living in Seattle, sorting it into a separate file she titled "capitol_one_inclusion_list." 2-ER-285–87; 4-ER-777–78.

Thompson stole data from other AWS customers too, and that data included not just PII but also application source code and security certificates. 2-ER-251; 3-ER-589–90; 4-ER-610, 612–13; 5-ER-913–14. In some cases, she planted cryptomining software on new virtual servers she created within victims' cloud computing environments. 4-ER-790–92; 5-ER-909–10. That software allowed her to mine thousands of dollars' worth of cryptocurrency using victims' computing power, for which AWS billed victim companies. 4-ER-650, 661, 675; 5-ER-940.

The following explanation of Thompson's hacking scheme and her eventual discovery and arrest is drawn from the evidence the government presented at Thompson's trial.

> **A.  Thompson anonymously scans millions of AWS customer accounts to identify network vulnerabilities, steal security credentials, and download customer data**

The first step in Thompson's hacking scheme involved anonymizing her internet traffic using both a virtual private network (VPN) service

called iPredator and The Onion Router (Tor) software.[3] 4-ER-715–18, 720, 728–29. This multi-layer arrangement kept Thompson safe from discovery by somebody tracking her web traffic back to her home IP address. Thompson used this multi-layer anonymization precisely because she knew that she was committing a crime. When a friend warned her that she was engaged in "sketchy shit" that could land her in jail for hacking, Thompson responded: "Im like > ipredator > tor > s3 on all this shit . . . ." 2-ER-241.

Next, Thompson scanned the internet to identify AWS customers with vulnerabilities in their networks. Using programming scripts she wrote, Thompson scanned 37 million publicly available IP addresses hosted by AWS. 4-ER-740–41. Describing this process in an online chat with a friend, Thompson wrote: "the scanner takes about 20 hours total . . . pretty epic." 2-ER-249.

---

[3] So named because its function resembles the layers of an onion, Tor moves internet traffic through a series of internet nodes, each of which knows nothing about the previous node or the original sender but simply forwards the traffic to the next internet destination. 4-ER-718.

When she found vulnerable AWS accounts, Thompson then queried those accounts for security credentials. 4-ER-748–50. She wrote computer code to automate this process, and she saved about 200 sets of stolen AWS-customer credentials into a file on her computer. 2-ER-120; 4-ER-753, 760. The credentials allowed her to authenticate directly into victim companies' cloud-computing environments. As she described it in a text message to a friend, with the stolen credentials Thompson could "hijack . . . aws accounts." 2-ER-271.

What Thompson could do inside the AWS environments she hacked into depended on the permissions assigned to the credentials she stole. Some credentials allowed her to run a "sync" command to download data from AWS-customers' cloud storage. 4-ER-761. Running this command using the credentials she stole from Capital One, Thompson copied a huge trove of bank-customer data derived from credit card offers and applications. 3-ER-531, 536. Running the command in the cloud-computing environment of a company named Apperian, she downloaded a full copy of the company's database and complete product source code. 4-ER-610–13. From Survox, a market-survey company, Thompson copied

1.2 million customer-survey records including names, addresses, phone numbers, and email addresses. 5-ER-913.

Thompson compressed and stored on her computer the terabytes of data she stole from at least 30 AWS customers. 2-ER-282; 4-ER-764–69. But given the size and sensitivity of the data, she also looked for other storage options. In a private internet chat with another user, she asked: "you got a place I can upload 2.2TB of stuff. . . I can't really talk about what it is or how I got it . . . its just stuff . . . you know how it goes." 2-ER-261. Thompson also researched server rentals in Russia. 2-ER-277.

Although there is no evidence that Thompson distributed any of the data she stole in the months between her theft and her arrest, ample evidence shows that she researched ways to profit from it, and that she was considering leaking it online. *See, e.g.*, 2-ER-280–81 (Thompson's web searches for "credit card numbers algorithm" and "carding forums dark web"); 2-ER-233 (Thompson's Twitter messages about "giv[ing] Capital One's data] to this desperate chinese dude who scams people for research chems on reddit and drug forums"); 2-ER-245 ("Im gonna give it to worse people too, im gonna give it to an avid scammer, a chinaman who will find a good perm home for it on the black market, sealed with

the story behind it."). *See also* 2-ER-253 ("it pisses me off so bad, it makes me want to . . . leak these TSA s3 buckets I got").

Thompson also repeatedly bragged to friends about the data she stole. In one chatroom, she wrote: "I have like 1tb of capitol one's s3 buckets . . . thats not all, but of the s3 bucket scrapes thats prob the most egregious . . . lol." 2-ER-263. Shortly after she downloaded Capital One's data, she hinted to a friend that she had hacked "a very well known financial institution . . . cough cough." 2-ER-247. Several months later she wrote that she had "a mirror of all of [vodafone's] s3 buckets" and marveled "how am I not in jail[?]" 2-ER-267.

## B. Thompson uses victims' computing power to mine thousands of dollars of cryptocurrency

While she was searching for ways to make money from the AWS-customer data she'd stolen, Thompson was also profiting through cryptocurrency mining. Some credentials Thompson stole had permissions that allowed her to create new virtual servers inside AWS-customer accounts. Thompson exploited those permissions by trying to create as many new virtual servers as the AWS accounts would support. *See, e.g.*, 2-ER-259 (showing an error message Thompson received from one account she hacked that the account quota "allows for 20 more"

virtual servers but "[y]ou requested at least 100"). Thompson wrote computer code to deploy cryptocurrency miners inside the virtual servers she created and to then deposit the mined cryptocurrency into her online account, or "wallet." 2-ER-783–84.

Cryptocurrency is digital currency, and it is created, or "mined," by computers competing in a process to solve an algorithm. 4-ER-642, 645–47. The algorithms are so complex that cryptocurrency mining often is best achieved by combining computing resources in a "mining pool" and sharing the resulting cryptocurrency among participants. 4-ER-648–49. Cryptomining consumes large amounts of electricity, so is generally expensive to undertake. 4-ER-650. But because Thompson was creating the virtual servers that she contributed to mining pools inside AWS-customer accounts, the AWS customers or AWS bore the cost of the mining, while Thompson received the cryptocurrency payments. 4-ER-650–51; 5-ER-906, 941–42. What Thompson did is often called "cryptojacking," because it involves hijacking someone else's resources to mine cryptocurrency for one's own benefit. 5-ER-930.

To facilitate her cryptojacking, Thompson made other changes inside victims' AWS accounts. If the stolen credentials allowed her to, she

created technological "back doors" so that she could have persistent access to victim companies' web resources even if they discovered and fixed the vulnerability that first allowed her access. 3-ER-494–95; 4-ER-758, 791–92, 798–99.

Thompson also wrote and deployed code to erase the evidence of her cryptojacking from victims' computer logs. 4-ER-790–91. She not only scrubbed the evidence of her activities but indiscriminately deleted the full computing logs for the compromised virtual servers. 4-ER-791. Thompson described this to a friend as "a pretty comprehensive CYA routine" that "leaves the customer unable to do any kind of forensic recovery." 2-ER-242, 244.

Between March 10 and August 5, 2019, Thompson received 261 cryptocurrency payments from Nanopool, a mining pool to which she contributed computing power that she stole from AWS customers. 2-ER-288–89; 4-ER-661–63. The payments were in "ether" (a popular form of cryptocurrency), and based on ether's then-current value, totaled $10,014.03. 4-ER-642, 674–75. That money was only a portion of her cryptojacking proceeds; in a July 15 message to a friend, Thompson said:

"this isn't the only [wallet] address I use either I have about 20 others that have active nodes." 2-ER-263.

In July 2019, Thompson wrote in web chatrooms: "I have a 6 figure salary made for myself in crypto," 2-ER-263, and "I could turn my fuckin crypto jacking op into a full fledged enterprise I just dont have the motivation." 2-ER-270. She also blamed her victims, writing: "They'll have to prove its me and second its the users fault for letting it happen." 2-ER-273.

While Thompson profited, some companies she victimized received unexpectedly high usage bills from AWS. Survox's Director of Cloud Operations and Services was "shocked, very shocked" to receive a $53,000 bill when the company's typical monthly run rates from AWS were between $6,000 and $8,000. 5-ER-906. Having "a bill that's 10, 15 times" what Survox was accustomed to receiving put their "[operating] budget upside down." *Id*. AWS investigated unexplained usage across multiple customer accounts and refunded at least $115,000 in usage charges to customers whose accounts Thompson had compromised. *See* 5-ER-937–52.

13

Thompson showed no concern about the damage she was causing. Instead, she shared with a friend detailed instructions on how to replicate her hack, urging: "but yeah if you just wanna use it to learn how to do some shit with aws go for it its not my shit lol." 2-ER-265.

## II. Thompson "doxxes" herself to a stranger on Twitter and is caught

Several months after downloading Capital One's data, Thompson sent a series of unsolicited private Twitter messages to a freelance cybersecurity professional whom she had never met or spoken with. Using the Twitter handle "@erratic," Thompson began her series of messages this way:

 Get an archive of my twitter if you can and remember my name make a note somewhere you'll eventually find it you don't know now but you will understand later

Jun 17, 2019, 11:44 PM

 Im gonna dox myself

Jun 17, 2019, 11:45 PM

2-ER-228.[4] Then, Thompson provided a series of links to her posts on a coding website called GitHub, claimed to have "3tb" of data that she "jacked," and threatened to leak it online to a "scam[mer]." 2-ER-229–33. She also wrote: "Ive basically strapped myself with a bomb vest, fucking dropping capitol ones dox and admitting it," "I wanna distribute those buckets i think first," and "[t]heres ssns . . . with full name and dob." 2-ER-232.

Thompson's claims about having social security numbers and dates of birth, coupled with her threat to distribute the data to a scammer, ultimately caused the recipient of Thompson's Twitter messages to reach out to Capital One about the apparent data breach. 3-ER-455–46. On July 17, 2019, the cybersecurity professional emailed responsibledisclosure@capitalone.com, writing: "There appears to be some leaked s3 data of yours in someone's github / gist." 2-ER-227. She included the GitHub link Thompson had provided in her Twitter messages. *Id.*

---

[4] "Doxxing" is publicly broadcasting private information in an online forum, often with malicious intent. 3-ER-453.

In response, Capital One security professionals investigated and almost immediately realized the scope and seriousness of the breach. 3-ER-481–86, 489. Combining information in Thompson's GitHub link with open-source internet research, Capital One identified Thompson by name. 3-ER-490. It then referred the information it had about Thompson and the data breach to the FBI. 3-ER-489–90. Less than two weeks after Capital One learned about the breach, the FBI served a search warrant at Thompson's house and arrested her. 3-ER-586, 588.

The day of her arrest, Thompson was charged by Complaint for computer fraud in violation of 18 U.S.C. § 1030(a)(2). CR-1. She was later indicted on one count of wire fraud, multiple counts of computer fraud, one count of access device fraud, and one count of aggravated identity theft. 2-ER-211–21.

## III. Thompson is detained but then released on bond, and later convicted at trial of five felonies and two misdemeanors

### A. Thompson is held in pretrial detention for three months and then released

In August 2019, a magistrate judge ordered Thompson detained pretrial. 2-ER-225–26. The magistrate judge found that Thompson posed "a risk of nonappearance and a risk of physical danger and financial and

economic danger," in part based on threats Thompson had communicated to others and made online.[5] 2-ER-225. Two months later, the district court held a hearing on Thompson's motion to review and revoke the detention order. CR-44, 59, 62. Thompson argued, in part, that her status as a transgender woman put her at risk in pretrial detention. *See* CR-44 at 10–45. Although these detention-review proceedings marked the first substantive matter over which the district judge assigned to the case presided, the judge made several comments that suggested he already had views about the case.

The judge remarked on Capital One's "huge profits." 3-ER-348. And the judge said he had read some commentary suggesting that the company left itself "vulnerable to this kind of attack" by insufficiently investing in cyber security. *Id.* He then commented that transgender people have been "demonized in society." 3-ER-353. Next, the judge discussed *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), a case for which he had recently sat by designation in this Court. *See* 3-ER-353–54.

---

[5] The magistrate judge found that two people had sought protection orders against Thompson for harassment and stalking and that Thompson had threatened to commit "suicide by cop" and to "shoot up" a social media office in California. 2-ER-225.

*Edmo* involved Idaho prison authorities' refusal to provide gender confirmation surgery to a transgender inmate, but at Thompson's hearing, the judge said, "it sounds to me like the Bureau of Prisons isn't quite up to speed on how to cope with transgender people too." 3-ER-354.

In response, the government explained that although Thompson was housed in the male unit at FDC SeaTac, she was sharing a cell with another transgender inmate, she was continuing to receive her requested hormone treatments, and she was under the care of a BOP psychologist at the facility. 3-ER-355–56. Against Probation's recommendation and over the government's objection, the district court released Thompson on bond in November 2019 and imposed conditions of pretrial supervision. CR-67, 68.

Passages in other pretrial rulings reflect that the district court was focused on sentencing considerations at an early stage of the case. In its order denying Thompson's motion to dismiss the wire-fraud count, the district court stated that the fact Thompson was not alleged to have monetized the data she stole from Capital One and other victims was "irrelevant to the validity of the indictment." 2-ER-203. "Although," the

court said in a footnote, "it could, of course, have a significant impact at sentencing." *Id.*

The court also included a footnote commenting on Thompson's potential mitigation arguments in its order denying her motion to dismiss the CFAA counts in the indictment. 2-ER-191–92. Thompson argued that if she had "acted less erratically (rather than a person who has struggled her entire life with mental illness and her gender identity) and notified Capital One through its Responsible Disclosure Program (rather than alerting the information security community at large of the events in question), she surely would have not been charged." CR-160 at 1. The court correctly concluded that argument was "based on a counterfactual hypothetical." 2-ER-192. But the court added: "While this is not a decisive point for deciding this Motion to Dismiss, it would be an important factor at sentencing." *Id.*

As discussed below, Thompson violated pretrial-release terms that restricted her access to computers and the internet during a trip to a hacking conference in Las Vegas, and she then lied to U.S. Probation and Pretrial Services about doing so. *See* 2-ER-125–26; p. 27, *infra.*

**B.** **The jury finds Thompson guilty of wire fraud and multiple counts of computer fraud**

During Thompson's eight-day trial, the government put on 16 witnesses, including an FBI computer scientist who testified about the technical aspects of Thompson's hacking scheme and the evidence found on her computer. 4-ER-690–5-ER-856. Government expert witnesses also testified about cryptojacking (4-ER-640–90) and credit card fraud on the dark web (5-ER-963–91). The government's credit-card-fraud expert estimated that the data Thompson stole from Capital One could fetch as much as $650,000 on the dark web. 5-ER-987–88.

A cyber-security expert also testified on behalf of the government about the norms of the hacking community, including the difference between good-faith security research and malicious hacking. 5-ER-992–1017. He explained that one of the generally accepted standards of conduct for good-faith security researchers is "do no damage," and he testified that downloading data, deleting computer logs, changing security configurations, uploading malware, and cryptojacking all "cross[] a line into malicious hacking." 5-ER-1003–11.

Representatives from Amazon also testified (3-ER-371–450; 5-ER-893–901, 926–60, 1018–19), as did representatives from five victim

companies. 3-ER-458–582; 5-ER-1019–37 (Capital One); 4-ER-605–22 (Apperian); 4-ER-623–38 (Bitglass); 5-ER-863–91 (42Lines); 5-ER-902–19 (Survox). The representative from Apperian testified that the complete application source code and database Thompson stole from the company was worth "several million dollars" based on the acquisition price of Apperian when it was bought by another company in 2017. 4-ER-615. The Survox representative valued the 1.2 million customer-survey records Thompson downloaded from their system at $120,000. 5-ER-913–14.

Thompson's primary defense at trial was that her access to victim computers was not unauthorized under the CFAA because the vulnerability she found allowed her to gain that access. Thompson called several victim witnesses to testify that the data she copied from their systems was not valuable or was not in an easily readable or useable format. 5-ER-1019–37, 1041–55.

As for the cryptojacking charges, Thompson argued that planting cryptocurrency-mining software on victim computer systems did not impair those systems, but, if it did, her use of those computers was authorized because of the way the computer systems were configured. 5-

ER-1059. Thompson then argued that the government could not prove that she had done any cryptojacking at all. *Id.*

The jury ultimately rejected Thompson's arguments, returning verdicts finding her guilty of wire fraud, in violation of 18 U.S.C. § 1343; unlawfully obtaining information of a card issuer, in violation of 18 U.S.C. § 1030(a)(2); two felony counts and two misdemeanor counts of unlawfully obtaining information from a protected computer, also in violation of 18 U.S.C. § 1030(a)(2); and a felony count of transmitting a program, information, code, or command to a computer, intending to cause damage, in violation of 18 U.S.C. § 1030(a)(5). 2-ER-178–79. The jury acquitted Thompson of access device fraud and aggravated identify theft. 2-ER-180.

After the jury was dismissed, the district court told Thompson: "I'm sure you're disappointed, but this verdict is a balanced verdict, in the sense that it doesn't tie my hands at sentencing." 5-ER-1062–63. The court explained to her that because the jury acquitted Thompson of aggravated identity theft, "There's no mandatory minimum term." 5-ER-1063. The court continued: "You are a remarkable person, and we got to

22

see that. I really need you, though, to believe in yourself and believe in your lawyers going forward. Don't quit on yourself, okay?" *Id.*

## IV. The district court sentences Thompson to time served and probation

### A. The presentence report and the parties' sentencing memoranda

Thompson was sentenced in October 2022. 1-ER-8. The presentence report prepared by the Probation Office calculated her advisory Guidelines range as 210 to 262 months, accounting for $40 million in losses to Capital One. PSR ¶¶ 54, 124. Probation did not include a two-point reduction for acceptance of responsibility, explaining that "[a]s of completion of the presentence investigation the defendant has not clearly demonstrated acceptance of responsibility for the offense." PSR ¶ 63; *see* USSG § 3E1.1.

In its sentencing recommendation, Probation noted that Thompson's case had "made its way into every tech forum" and that a "punitive sentence" would tell others to expect "significant consequences" for engaging in similar conduct. Sentencing Recommendation at 8. Thus, while Probation recommended that Thompson's personal history and her transgender status warranted a significant downward variance, it said

23

that "allowing Ms. Thompson to entirely avoid punishment for one of the biggest data breaches in the history of this country because of her transgender status would send a message to the community that transgender individuals may be above the law." *Id.* at 9.

After reviewing Thompson's personal history and characteristics as well as her offense conduct, Probation concluded: "This case is complex; the conduct and the defendant are riddled with competing and complicating aggravating and mitigating factors. Ultimately, the conduct is serious, the victims suffered significant harms, and a significant sentence is warranted." *Id.* at 6. Probation recommended a custodial sentence of 24 months followed by three years of supervised release. *Id.*

Although "[i]t is not generally [the] department's practice to provide an alternative sentencing recommendation," Probation also provided an alternative sentencing option. *Id.* at 8. Probation discussed the "extenuating circumstances" of Thompson's status as a transgender woman. *Id.* Noting the "possibility," but not the "guarantee," that Thompson "would be housed with women" in prison, Probation suggested that she could be sentenced to time served and five years of probation, with a 36-month term of home incarceration or home detention. *Id.* at 9.

The government argued that Thompson had committed one of the largest data breaches in United States history, exfiltrating the personal identifying information of over 100 million people and causing tens of millions of dollars of damage. 2-ER-120. The evidence at trial and sentencing showed that Capital One was severely financially affected by Thompson's hacking. All told, including the technology costs related to remediation and recovery, the costs of notifying impacted customers and providing them credit-monitoring services, and the $190 million settlement and fee costs from a multi-district consumer lawsuit stemming from Thompson's hack, Capital One incurred at least $230 million in costs attributable to Thompson's breach.[6] *See* 1-ER-25; 2-ER-127–29.

Other victim companies also sustained substantial financial losses from Thompson's data theft and cryptojacking. The data-theft victims sustained financial losses from the costs of responding to the breach and

---

[6] The government explained that the settlement cost of $190 million was properly included in the loss calculation as a direct and reasonably foreseeable consequence of Thompson's hack. But because the government's sentencing recommendation was well below the Guidelines range calculated by Probation based on a $40 million loss, it was unnecessary for the district court to include that amount in its Guidelines calculation, and the government did not ask the court to do so. 2-ER-127.

participating in the prosecution but declined to seek restitution.[7] *See* 2-ER-120–21. And all the victim companies suffered reputational harms from being linked to such a significant and well-publicized data breach. In fact, some perceived the ongoing reputational harm of being associated with Thompson's hack as so severe that they chose not to submit victim-impact materials at sentencing. 2-ER-120–21, 141.

In its sentencing presentation, the government also stressed the criminal justice system's critical role in deterring illegal hacking. 2-ER-135–36. The government explained that the considerable national and international media attention on Thompson's case meant that the public, security professionals, and cybercriminals were all watching to see what measure of accountability the court would impose. 2-ER-135. The government provided the court a letter from a senior researcher at a leading information security company explaining the criminal justice system's "important role in raising the perceived cost of an intrusion" to help deter future attacks. 2-ER-177. Driving home this point, the

---

[7] AWS generally reimbursed victims for the unauthorized usage charges Thompson incurred on their AWS accounts through her cryptojacking, *see* 5-ER-937–52, but AWS did not ask for restitution for its losses or otherwise participate at sentencing.

government informed the court that Thompson's pretrial release was expressly referenced in the correspondence of international criminal actors under FBI investigation for a different hacking scheme. 2-ER-135.

The government stressed that Thompson had expressed no remorse for her actions. 2-ER-130–32. Rather, the evidence showed that while on pretrial release, Thompson withdrew financial proceeds of cryptojacking totaling almost $45,000 from two cryptocurrency wallets and that she violated conditions of pretrial release that restricted her access to computers and the internet during a trip to a hacking conference in Las Vegas, and then lied to Pretrial Services about doing so.[8] 2-ER-123–26. The government thus opposed any reduction for acceptance of responsibility and explained that Thompson had "crafted a false narrative in which she [wa]s the hero and her victims [we]re the villains." 2-ER-133.

The government agreed with Probation's Guidelines calculation and stated that "a significant sentence is necessary to recognize the

---

[8] Thompson's travel to DEF CON 2022, an annual hacker convention, was approved by the Probation and Pretrial Services Office, but the computer-use restrictions of her Appearance Bond remained in effect. 2-ER-125–26.

seriousness of this offense and to deter Thompson and others from engaging in similar conduct," especially where "Thompson has made it clear that she believes her crimes were no big deal and that her victims are to blame." 2-ER-117. Still, recognizing "that Thompson could have caused even more harm than she did, that her decision-making was influenced by her mental health circumstances, trauma, and lack of a robust support system, and that there are widely recognized medical, mental, and physical risks she will face in prison as a transgender woman," the government recommended a below-Guidelines sentence of 84 months followed by five years of supervised release. 2-ER-117, 139. The government described BOP's significant efforts to meet the needs of its approximately 1,500 transgender inmates, including the establishment of a Transgender Executive Council to make facility-designation decisions considering current gender expression, medical and mental health needs, and vulnerability. 2-ER-137.

The defense recommended a sentence of time served followed by three years of supervised release. 2-ER-83. The defense argued that Thompson had faced "a great deal of personal, physical, emotional, socioeconomic, and cognitive instability and trauma in her life." 2-ER-83–

84. The defense also submitted a posttrial psychological assessment diagnosing Thompson with autism spectrum disorder, as well as letters of support from four of Thompson's friends and associates. 2-ER-84, 92–93. And the defense detailed the difficulties faced by transgender inmates in prison. 2-ER-98–103. Consistent with its trial strategy, the defense continued to assert that Capital One was responsible for its own losses and that the severity of the offense was overstated because the stolen data was difficult to read or use. 2-ER-93–96.

### B. The district court's comments at sentencing and its sentencing determinations

The district court opened the sentencing hearing by stating: "I think this is such an important sentencing that I want to give it a theme, if you will. And my theme is that, 'The arc of the moral universe is long, but it bends towards justice.'" 1-ER-10.

The court then spoke at length about the changes it had observed in the criminal justice system over the past 45 years, including the increased racial and gender diversity within the U.S. Attorney's Office and Probation Office, as well as on the state and federal benches. 1-ER-11–17. The court thanked the parties and court staff for their work on the case. 1-ER-17. The court commended the defense team for helping

Thompson "survive . . . the ordeal of having all this negative attention on her, and her lifestyle, and nitpicking any text message she ever sent, or anything she mused about on a website." *Id.*

The court then listened to the arguments of the parties. 1-ER-18–54. Next, Thompson briefly addressed the court, noting her recent official diagnosis of autism spectrum disorder and her desire "to be gainfully employed again, and contribute something meaningful to the world." 1-ER-54–55. Thompson's statement included no apology or expression of remorse for the harm that she had caused.

The court responded to Thompson that "a number of the giants of the tech industry are somewhere along that Autism Spectrum Disorder, too." 1-ER-55. The court also said that it "kind of expect[ed] to get . . . some sort of acceptance-of-responsibility-type letter." *Id.* Only then did Thompson respond: "I'm very sorry about this." *Id.*

The court then made its findings, stating that "while it may be a close call, I think the minus two for acceptance of responsibility should be applied here." 1-ER-55. The court agreed with Probation's $40 million loss amount and found Thompson's Guidelines range was 168 to 210 months. 1-ER-56.

The court spoke at length about the importance of sentencing guidelines because of the "disparity from district to district, within the United States," and said that "the question of what is justice here is a really, really hard question." 1-ER-56–58. The court also explained that "some people out there . . . are looking at the cost-benefit analysis and saying: Man, if I can get away with credit for time served of 100 days, with the possibility of making a couple hundred million dollars with this, I'm going to take the chance," and that hacking is "not like a crime of passion that happens, when people are not considering those things." 1-ER-58–59.

The court found Thompson had committed "a terrible crime" but then expressed its belief that "Thompson was shocked that she got in" to the victims' AWS accounts and that she was "tortured and tormented about what she did." 1-ER-59. The court did not point to any evidence that Thompson was tortured or tormented or explain its comment. "Ultimately," the court said, "she was caught before she did anything bad, or anything good." *Id.* "And so," the court continued, "it doesn't argue for sending her to prison. And it also doesn't argue for not sending her to prison. It's just the facts of the case. And it's a tough one." *Id.*

The court then returned to its "theme" for the sentencing—"The arc of the moral universe bends towards justice"—and tied that theme to "the issue of [the] treatment of transgender defendants in the criminal justice system," which it called a "tough one." 1-ER-59–60. The court acknowledged that BOP had established a Transgender Executive Committee and called that decision "enlightened." 1-ER-60. But the court then said that the Transgender Executive Committee did not solve "other issues," like "placing transgender women, who still have male genitalia, into women's prisons. We've had allegations of women claiming they were raped by transgender women, who still had the package" and "[w]e've had allegations that women in the prison demanded sex from a transgender person, or they were going to be beaten up, or whatever." *Id.* As a result, the court explained, "the time that a transgender person serves in prison is going to be difficult, for sure, under any circumstances." *Id.*

The court also expressed concern that BOP's treatment of transgender inmates might someday change. It said, "We also don't know what might happen in 2024, if there's a change in administration, and a change in philosophy." 1-ER-60. It said that "the person who becomes in charge" in the future might have "more of the older attitude that these

people should just get over it, and be the gender they were born with" or treat transgender persons as "depraved" or conclude that they should "be ignored." *Id*. And the court again tied this concern to its theme: "As Dr. King said, 'The arc of the universe is long.' Sometimes it's two steps forward, one step back; sometimes it's two steps back, one step forward." *Id*.

The court described Probation's recommendation of two years in prison as "a very reasonable position," but explained that the probation officer "did do me the favor of coming up with a potential alternate approach. And that's the one that I'm going to take." 1-ER-60–61.

The court then imposed a sentence of time served on Count One (wire fraud) "because probation is not available for Count 1." 1-ER-61. For the remaining counts, the court imposed five years of probation with three years of home detention ("more of a location monitoring than home incarceration, which is a real lockdown kind of thing"). *Id*. The court also imposed a requirement of 50 hours of community service per year during Thompson's five years of probation, stating that there "are a lot of nonprofit agencies or schools that could use her advice in this area." 1-ER-64.

In closing, the court stated it had "seen Ms. Thompson evolving, over the three years since we started." 1-ER-65. And it said: "I do not believe Paige Thompson will reoffend. . . . I believe in her, and I believe that she will prove that this was the right sentence, going forward." *Id.*

Two months later, following another hearing, the court entered forfeiture and restitution orders. *See* CR-399, 400. But before doing so, the court echoed the comments it had made during pretrial detention proceedings suggesting that Capital One was partly to blame for Thompson's hack.

Specifically, during the forfeiture and restitution hearing the court pointed out that Capital One had just sponsored the World Series, "so it's not like they don't have hundreds of billions of dollars to, you know, I would say, fritter away on sponsoring the World Series or paying Samuel L. Jackson to say things, or whatever other stars." 5-ER-1077. The court continued: "You know, let's not paint Capital One as the kind of victim that we're usually talking about here with restitution." *Id.* When the government explained that it was not seeking restitution for Capital One's $190 million civil settlement, the court chided: "[L]et's just focus on the harms that were actually caused by what Ms. Thompson did

34

rather than what was caused by Capital One being frivolous with security and, you know, putting much more of their money into advertising than security."[9] 5-ER-1077–78.

### C. Thompson's post-sentencing conduct

In May 2023, seven months into Thompson's term of probation, the Probation Office petitioned for a hearing to address its concerns with Thompson's behavior. 2-ER-78–79. Probation noted that since her sentencing, Thompson "ha[d] not made attempts to obtain gainful employment or provide proof of community service hours, and disengaged from mental health treatment." 2-ER-79. When questioned, Thompson told her probation officer that she "only want[ed] to work in the technology industry," and that her "physical and mental health are barriers to obtaining employment," but did not describe how she was "attempting to mitigate these issues through treatment." *Id.* Instead, she told Probation that "she feels she is no longer in need of mental health treatment at this time." *Id.*

---

[9] At trial, the district court heard evidence that in 2019 the annual budget for the 700-person Cyber Organization at Capital One—just one part of the company's internal technology and security group—was $200 million. 3-ER-464–65. The court heard no evidence about Capital One's advertising budget.

The location-monitoring specialist reported to Probation that Thompson "rarely submits passes to leave her residence for treatment and has not submitted any pass requests for job searches or interviews," although she had used her earned leave "to go to the movies, attend a party, and visit a recreational venue." *Id.* Meanwhile, Thompson had made no payments toward her restitution obligations, telling Probation that she was "unable to make payments because she is financially dependent on her roommate." *Id.*

Probation asked the district court to modify Thompson's conditions of probation to set a required monthly restitution payment of $50. 2-ER-78. The court declined the request, instead directing Probation to update the court in another 60 to 90 days. 5-ER-1098. Addressing Thompson, the court suggested, "[W]hy not engage with your probation officer a little bit?" 5-ER-1097.

Right after the hearing, Thompson moved the court to allow her to travel to Las Vegas to attend DEF CON, the same hacking conference she had attended while on pretrial supervision. 2-ER-76. She explained that her roommate, who also planned to attend the conference, would pay for her airfare, hotel, and expenses. 2-ER-77. Probation and the

36

government both opposed the request. 2-ER-73–74. The district court denied Thompson's motion. CR-411.

A month later, Probation again petitioned for a hearing, alleging that Thompson had committed three violations of her conditions of probation. 2-ER-70. At the hearing in August 2023, Thompson did not contest Probation's allegations that she had used a computer without computer monitoring software installed, had failed to notify Probation of a change in employment, and that she had still made no restitution payments. 2-ER-70; 5-ER-1101–03.

The court set a hearing on revocation of probation (now rescheduled for October 2023). 5-ER-1103; CR-421. It then addressed Thompson. The court said that it understood that Thompson might have difficulty finding a job considering the restrictions on her computer use and commented that "I'm not trying to micromanage your life, really, but I do need you to meet me at least part of the way." 5-ER-1104–05. Thompson replied, "meeting you halfway was something that I'd be happy to discuss. And I just—I—it will just—it will have to be a discussion." 5-ER-1105.

## SUMMARY OF ARGUMENT

Thompson faced a Guidelines sentencing range of 210 to 262 months of imprisonment. The district court, finding that Thompson had accepted responsibility for her crimes, arrived at a Guidelines range of 168 to 210 months. But then the court sentenced Thompson to time served and five years of probation. The court failed to articulate a rationale sufficient to justify its 98% downward variance from the low end of Thompson's adjusted Guidelines range, the court did not reasonably consider the Section 3553(a) sentencing factors, and the sentence it imposed is substantively unreasonable.

The only apparent bases for Thompson's exceptionally low sentence are that Thompson is a transgender woman so her time served in prison would be "difficult"; that Thompson did not sell the massive trove of PII she stole from Capital One; that she was diagnosed with autism spectrum disorder; the district court's fear that "unenlightened" people will dismantle BOP's Transgender Executive Committee in the future; and the court's lack of sympathy for Capital One as a victim (the court did not acknowledge the harm to Thompson's other victims).

The first three factors were appropriate to consider—indeed, they were reflected in the government's recommendation of a below-Guidelines sentence of 84 months. But they are not enough to support the dramatic downward variance the court gave here. And the court's predictions about future political developments and its apparent lack of sympathy for corporate victims should not have informed its sentencing decision. Moreover, Thompson's sentence does not reflect consideration of the other applicable Section 3553(a) factors, including the need for general deterrence—a factor that courts have identified as a prime consideration in white-collar cases, and, by extension, in a hacking case of this scale and notoriety.

Although this Court's review for substantive reasonableness is deferential, the sentence here is shockingly low considering the Guidelines range, the seriousness of Thompson's offenses, the harm she caused, the need to avoid unwarranted sentencing disparities, and the need to promote respect for the law and deter this kind of criminal conduct. The district court abused its discretion, and this Court should vacate the judgment and remand for resentencing.

# ARGUMENT

## I. Thompson's sentence is substantively unreasonable

### A. *Standard of review*

Whether a sentence is substantively reasonable is reviewed under an abuse-of-discretion standard which "is deferential, but does not mean anything goes." *United States v. Ressam*, 679 F.3d 1069, 1087 (9th Cir. 2012) (en banc). Appellate review for substantive reasonableness should not be a "rubber stamp." *Id.* Rather, this Court will reverse a sentence as substantively unreasonable if it has a "definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." *Id.* (quotation marks and citation omitted).

### B. *General sentencing standards*

In fashioning a sentence, a district court must first correctly calculate the Sentencing Guidelines range. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The district court must treat the Guidelines range as the "starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). And the district court must keep the range "in mind throughout the [sentencing] process." *Carty*, 520 F.3d at 991. The district court then must consider the factors set forth in 18

40

U.S.C. § 3553(a), including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to afford deterrence, and to protect the public; the Sentencing Guidelines; and the need to avoid unwarranted sentencing disparities. *Carty*, 520 F.3d at 991; 18 U.S.C. § 3553(a).

This Court must reverse a sentence if it is either procedurally erroneous (a claim not raised in this appeal) or substantively unreasonable. *Gall*, 552 U.S at 51. The sentence here is substantively unreasonable.

## C.    *Substantive reasonableness review*

"The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Christensen*, 828 F.3d 763, 820 (9th Cir. 2015) (quoting *Ressam*, 679 F.3d at 1089). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conaster*, 514 F.3d 508,

520 (6th Cir. 2008). It is not sufficient for the district court to simply "s[ay] that it considered the factors set forth in 18 U.S.C. § 3553(a) and provid[e] some explanation of its reasoning." *Ressam*, 679 F.3d at 1086. Although the district court need not explicitly discuss each factor individually, the court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.

That is particularly the case when, as here, the sentence at issue represents a substantial variance from the applicable Guidelines range because a "major departure should be supported by a more significant justification than a minor one." *Id.* This Court thus considers "the degree of variance for a sentence imposed outside the Guidelines range" as a factor in assessing the reasonableness of the sentence. *Carty*, 520 F.3d at 993.

That the sentence falls outside the Guidelines range does not mean that it is presumptively unreasonable. *United States v. Edwards*, 595 F.3d 1004, 1015 (9th Cir. 2010). But when a sentencing judge imposes a sentence outside the Guidelines range "'he must consider the extent of the deviation and ensure that the justification is sufficiently compelling

42

to support the degree of the variance.'" *Carty*, 520 F.3d at 991 (quoting *Gall*, 552 U.S. at 47).

**D.** ***The district court did not rationally and meaningfully consider the Section 3553(a) factors***

In imposing time served and probation, the district court varied downward about 98% from the low end of Thompson's Guidelines range. This sentence is insufficient to meet the requirements of 18 U.S.C. § 3553(a) for an offender who committed one of the largest data breaches in United States history, caused tens of millions of dollars of loss, and showed little remorse or contrition.

Announcing its sentence, the district court failed to provide the kind of "significant justification" the law requires when a court chooses to radically depart from the Guidelines range. *Gall*, 552 U.S. at 50. Instead, the court focused on one Section 3553(a) factor—Thompson's history and characteristics (in particular, her status as a transgender woman)—and did not balance that factor against the seriousness of Thompson's offenses, the goals of general and specific deterrence, the need to protect the public, and the need to avoid unwarranted sentencing disparities.

Thompson's history and characteristics merited consideration. The United States recommended a below-Guidelines sentence because of them. But Thompson's history and characteristics cannot bear "the apparently decisive weight assigned to them by the district court." *United States v. Caesar*, 10 F.4th 66, 86 (2d Cir. 2021). The district court's consideration of one sentencing factor to the exclusion of all others resulted in an unreasonably low sentence in this case.

> 1.    *The district court failed to weigh the seriousness of Thompson's offenses*

Throughout the trial and at sentencing, the government presented abundant evidence of the seriousness of Thompson's crimes and the harm she caused. The government detailed the tens of millions of dollars in financial losses and the weeks of work by all the victim companies to understand the vulnerability in their systems, correct it, and mitigate the damage from stolen data and compromised resources. *See, e.g.*, 2-ER-175.

Yet the district court significantly understated the seriousness of Thompson's offenses. The court mentioned that consideration only once before imposing sentence, and then dismissively and only in passing. Characterizing the defense's argument, the district court said:

> It's also absolutely appropriate for the defense to say, as terrible as the crime was—they're not conceding—but I find it was a terrible crime. The individual was not doing it in the malicious manner that you want to punish, to the same degree as somebody who gets that information and immediately turns to monetizing it in some way.

1-ER-59.

The court was wrong to suggest that it was fair for the defense to say that Thompson's crimes were not malicious. Thompson's own statements make clear that they were. Trial testimony by the government's cyber-security expert also showed that Thompson's actions such as downloading data, deleting computer logs, changing security configurations, uploading malware, and cryptojacking all "cross[ed] a line into malicious hacking." 5-ER-1003–11.

Also, while Thompson did not monetize the data she stole from Capital One, the court focused on that fact to the exclusion of evidence that she monetized her hacking in a different way. She placed cryptojacking software on other victims' servers where the security credentials she stole gave her the necessary access. Thompson also caused disruption for the AWS customers whose billing statements suddenly reflected tens of thousands of dollars of server usage for cryptomining. And she caused anxiety to customers whose PII was stolen,

who did not know what had been done with their information, and at a minimum did not want it stored on a computer in Thompson's bedroom. *See, e.g.*, 3-ER-596–99 (testimony of Capital One customer whose stolen PII was sorted by Thompson into the Seattle inclusion list and used by Thompson to create an email address of which the customer was unaware).

The court seemingly gave no weight to these real and serious harms. It did not otherwise discuss Thompson's offenses. Nor did it explain how 100 days of pretrial detention and five years of probation was sufficient, but not greater than necessary, to reflect their seriousness, punish Thompson for committing them, and promote respect for the law. Instead, the court focused on the "arc of the moral universe" and the "treatment of transgender defendants in the criminal justice system." 1-ER-59–60. As the Second Circuit explained in *Caesar*, recognizing that a defendant's crimes were "serious" but then imposing a strikingly low sentence out of concern for the defendant's well-being in prison does not "meaningfully balance" the Section 3553(a) factors. 10 F.4th at 83. *See also id.* ("We cannot reconcile that with the 48-month sentence imposed.").

Taken as a whole, the record suggests the district court was inclined to discount the seriousness of Thompson's crimes from the outset. Responding to the government's argument during the October 2019 pretrial detention hearing that Thompson could cause tremendous harm with her hacking, as shown by the $100 million loss Capital One was then already anticipating, the court remarked that Capital One would "still be making huge profits." 3-ER-348. And before hearing or considering much of the evidence, the court twice signaled in pretrial orders denying Thompson's motions to dismiss that it was inclined to give her mitigation arguments significant weight at sentencing. *See* 2-ER-192, 203. But Thompson committed a vast data breach with far-reaching consequences. The district court unreasonably failed to weigh this factor in deciding Thompson's sentence.

> ### 2. *The district court failed to weigh the need for adequate deterrence*

At sentencing, the government argued that a significant period of imprisonment was necessary in a case of this magnitude to deter future hackers. 2-ER-135–38. The district court acknowledged this sentencing factor but then—just as with the seriousness of Thompson's offenses—gave it no apparent weight.

The only mention of general deterrence by the district court was to acknowledge that the government was "absolutely right" that other hackers might be willing to risk a sentence "for time served of 100 days" if it meant possibly making several million dollars. 1-ER-58–59. But the court then said nothing further about the need for general deterrence and ultimately gave no explanation for discounting this sentencing factor.

Affording no apparent weight to the need for general deterrence in a high-profile cybercrime case like this one was unreasonable. It was especially so where the court itself acknowledged the importance of general deterrence of cybercrimes which, like most white-collar crimes, are not crimes of passion. 1-ER-59. Indeed, in preparing the Sentencing Reform Act, the Senate Judiciary Committee highlighted this factor, pointing out that deterrence "is particularly important in the area of white collar crime." S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. Courts have recognized this, too. *See, e.g.*, *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) ("Congress has recognized that general deterrence is particularly important in the context of white collar crime."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are

more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. . . . Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." (quotation marks and citation omitted)); *see also United States v. Slavin*, No. 21-10123, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022) (citing *Sample*, *Martin*, and S. Rep. No. 98-225).

One of the government's expert witnesses testified at trial that hackers commit their crimes for many reasons, not just for financial gain. 5-ER-1001–02. Successful hacks garner reputational rewards, and some hackers are simply looking for notoriety. *Id.* Others may hack for political or ideological reasons, for revenge, or out of curiosity. Effective deterrence must account for all these motivations; a hacker looking for notoriety, for example, is unlikely to be deterred by a slap on the wrist— in fact, that hacker might be encouraged by public acknowledgment of her crimes. That hacker would, however, be deterred by a sentence involving significant prison time.

The district court also heard evidence at trial that no computer system is completely secure, opportunities for hacking are legion, and

breaches are inevitable. *See* 5-ER-894, 998–99. Accordingly, as the government explained in its sentencing presentation, it is vital that would-be hackers see that the potential economic and reputational benefits of this type of computer intrusion are outweighed by stiff punishment. 2-ER-135–36. Yet the sentence the district court imposed here was anything but stiff punishment.

The district court knew that Thompson's case was extensively reported on by the press. *See supra* at pp. 1–2 nn.1 & 2; *see also* 1-ER-43. The court also knew that the case was being closely watched by security professionals. *See* 2-ER-177 (letter from senior cloud security researcher). And the court's own comments, coupled with the evidence the government provided about other criminal actors discussing Thompson's case, show that the court understood that cybercriminals following the case likely would be influenced by its outcome. Despite all of this, rather than explaining how its remarkably low sentence would provide accountability for Thompson's crimes or deter others, the district court simply said nothing. The court engaged in no meaningful weighing of the need for deterrence. This too was a "clear error of judgment" requiring correction by this Court. *Ressam*, 679 F.3d at 1087.

      3.     *The district court ignored evidence of Thompson's bad motives and inaccurately assessed her characteristics*

The record is replete with evidence that Thompson blamed the victims of her hacking, bragged about what she had done, felt entitled to enrich herself through criminal means, and was not sorry. Rather than addressing any of that evidence at sentencing, the district court found that Thompson was "tortured and tormented" by her actions. 1-ER-59. That determination lacked any evidentiary foundation. It was unreasonable and resulted in an inaccurate weighing of Thompson's history and characteristics.

As shown at trial, time and again Thompson's words and actions reflected how she felt about what she was doing. *See, e.g.*, 2-ER-273 ("They'll have to prove its me and second its the users fault for letting it happen.") 2-ER-263 ("Im a crook too"); *see also id.* ("people still get paid to do IT, and they should be protecting their assets better than they are. . . people that I'm 1,000x more qualified than"); 2-ER-256 ("heh heh heh heh heh . . . gottem . . . smells like bacon."). Four months on from when she first stole data from Capital One, her tone had not changed. *See* 2-

51

ER-265 ("but yeah if you just wanna use it to learn how to do some shit with aws go for it its not my shit lol").

The district court referred to this evidence only once: it expressed sympathy for the "ordeal" Thompson had been through "having all this negative attention on her, and her lifestyle, and nitpicking any text message she ever sent, or anything she mused about on a website." 1-ER-17. *See also id.* ("Just imagine somebody going through everything that you wrote down or thought out loud."). Otherwise, the district court ignored Thompson's statements, instead concluding that Thompson was "shocked that she got in." 1-ER-59.

Thompson's Twitter messages exposing her actions, some of which are shown below, were, in the court's estimation, her attempt "to get somebody to help." *Id.*



2-ER-232. But the evidence at trial did not support the court's view about Thompson's motives for reaching out to a stranger on Twitter with this information. While Thompson's messages show she wanted exposure ("Come on i deserve to get exposed") and perhaps thought that a popular Twitter user could help her get noticed, they cannot reasonably be read as an attempt to persuade a stranger to help her disclose Capital One's security vulnerability so it could be fixed. Had that been Thompson's true aim, she could have sent an anonymous message through Capital One's

53

responsible-disclosure channels. Not only is there no evidence that Thompson did so, but her online search history shows that rather than trying to find information about how to responsibly disclose to the companies she had hacked, she was searching for information about credit-card fraud and server rentals in Russia. 2-ER-277–79; 3-ER-591.

Perhaps because it contradicted the narrative that Thompson was contrite, the court also ignored the evidence that Thompson continued to profit from her crimes while on pretrial release. Thompson cashed out two of her cryptocurrency wallets in 2020 and 2021 when, because of a rise in cryptocurrency value, the wallets contained almost $45,000. 2-ER-143–67. The government argued that withdrawing this money rather than allocating it toward restitution showed that Thompson was not remorseful. 1-ER-38. The government also presented evidence that Thompson had violated the conditions of her release, after her conviction but before her sentencing, by using computers and then lying about it to her probation officer. 1-ER-38–40; 2-ER-169–73.

The court said nothing in response to any of this evidence or argument by the government. Instead, after pronouncing sentence, the

court said it had seen Thompson "evolving" and did "not believe Paige Thompson will reoffend." 1-ER-65.

In that respect, the district court erred in much the same manner as the district court in *Ressam*. In *Ressam*, the sentencing judge credited the defendant with significant cooperation, even though the record showed the defendant's decision to cease cooperating "made it impossible for the government to proceed with certain prosecutions and led to the release of certain suspected terrorists." 679 F.3d at 1092. Between his original sentencing in 2005 and his resentencing in 2008, Ressam had "affirmatively repudiated his agreement to cooperate, recanted his testimony, and done everything he could to diminish the assistance he had already provided." *Id.* Nevertheless, at resentencing the district court said that "Ressam's cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today." *Id.* "Treated as a factual finding," this Court held, "the district court's assessment of Ressam's cooperation was clearly erroneous." *Id.*

The district court made a similar error here; it found that Thompson was transformed by her trial and that she had been tortured

and tormented by her crimes. But there was no evidence of transformation, and the record flatly contradicted the notion that Thompson was tortured and tormented by her actions. The court did not explain how or why it reached these conclusions in the face of contrary evidence. These mistakes contributed to the court's abuse of discretion. Simply put, the district court did not rationally and meaningfully weigh Thompson's history and characteristics in deciding what sentence to impose.

4.    *The district court did not address the need to avoid unwarranted sentencing disparities*

The sentence the court imposed also failed to meet the need to avoid unwarranted sentencing disparities among similar defendants nationwide. 18 U.S.C. § 3553(a)(6); *see United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Congress's primary goal in enacting 18 U.S.C. § 3553(a)(6) was to promote national uniformity in sentencing" (citation omitted)). The court never mentioned this factor other than to say that sentencing guidelines are an important tool for avoiding disparate sentences. 1-ER-57–58. The court then varied 98% below Thompson's Guidelines range without explaining what justifications it found "sufficiently compelling to support the degree of the variance."

*Carty*, 520 F.3d at 991 (quoting *Gall*, 552 U.S. at 47). And a review of the U.S. Sentencing Commission statistics for defendants sentenced in fiscal year 2021 shows that the sentence here was a significant outlier.

During fiscal year 2021, the median loss in theft and fraud cases was $134,086, with only 15% of those cases involving losses greater than $1.5 million. *See* United States Sentencing Commission, Quick Facts for Theft, Property Destruction and Fraud Offenses (July 2022), https://www.ussc.gov/research/quick-facts/theft-property-destruction-fraud. Just over 58% of defendants received Guidelines sentences; the remaining 41.9% received a variance, usually downward. The average sentence reduction for defendants who received a variance was 59.6%.

What these statistics illustrate is that Thompson's crime involved a loss that was orders of magnitude greater than in 85% of cases, and almost certainly greater than in only a tiny fraction of cases. But her sentence was only 16% of the average sentence imposed (21 months) across all fraud cases. Although there is not available public data to confirm the point, Thompson is likely one of a few, if not the only, theft or fraud defendant with a Guidelines sentencing range of at least 10

57

years (in Thompson's case, 14 years) to receive a time-served sentence of three months or less.

To the extent that sentences in other white-collar cases from the district where Thompson was convicted may also serve for comparison, those sentences suggest that Thompson's time-served sentence creates an unwarranted disparity as well. The average sentence in the 53 Fraud/Theft/Embezzlement cases from the Western District of Washington in fiscal year 2021 was 16 months.[10]

Although Thompson's case differs because she did not monetize the massive trove of data she stole from Capital One, the sentences imposed recently in the Western District of Washington in large-scale hacking cases have been steep. For example, in 2017, Roman Seleznev received a Guidelines sentence of 27 years for computer-hacking crimes that caused more than $169 million in damages to small businesses and financial institutions after he stole and sold millions of credit card numbers. *See United States v. Seleznev*, 766 F. App'x 531, 534 (9th Cir. 2019)

---

[10] *See* United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2021, Western District of Washington (April 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/waw21.pdf.

(unpublished). A year before Thompson was sentenced, Muhammad Fahd pleaded guilty and received a below-Guidelines 12-year sentence for hacking and unlocking AT&T cell phones, ultimately inflicting more than $200 million of damage. *See United States v. Muhammad Fahd*, W.D. Wash. 2:17-cr-00290-RSL, Dkt. No. 86. Fahd was sentenced by the same district judge who presided in this case.

Whether considered locally or nationally, the striking disparity in sentencing here is unreasonable and unwarranted. The district court did not even try to explain otherwise.

5. *The sentence was driven by the district court's desire to spare Thompson from prison*

"The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Christensen*, 828 F.3d at 820 (quoting *Ressam*, 679 F.3d at 1089). The record here shows that the district court did not rationally and meaningfully consider the seriousness of Thompson's offenses, the need for deterrence, or the need to avoid sentencing disparities. Nor did the court accurately assess Thompson's history and characteristics when it ignored all the evidence of her motives and intent. Instead, the district court focused on the "arc of the moral universe," the

historical and current mistreatment of transgender people, and the difficulties Thompson could face as a transgender inmate. It rejected the government's evidence that BOP has procedures in place to ensure proper treatment of transgender inmates on the ground that "we also don't know what might happen" in the future. 1-ER-41–43, 60; 2-ER-137.

Thompson's personal circumstances were appropriate for the court to consider, just like it would be appropriate to consider any defendant's history of past trauma and medical or psychological prognosis in a prison setting as part of assessing that defendant's history and characteristics. But those circumstances cannot be the only consideration or the sole driver of the court's sentencing decision. And the court's reason for discounting the evidence that BOP has procedures to ensure the proper treatment of transgender inmates here was speculative.

The court's approach lost sight of the seriousness of Thompson's crimes, eliminated any deterrent effect from its sentence, and created unwarranted sentencing disparity. Compassion for a defendant's particular history and characteristics is never the only interest before a sentencing court. The district court abused its discretion by sentencing Thompson based almost entirely on its (one-sided) view of her history and

characteristics to the exclusion of these other factors, each of which heavily favors a longer sentence here.

The Second Circuit recently held as much in *Caeser*, a material-support prosecution where the defendant, who had suffered horrible abuse as a child, faced a Guidelines range of 360 to 600 months but was sentenced to 48 months. The Second Circuit wrote that the defendant's "need for rehabilitation from years of trauma and abuse was one factor that the district court could have properly taken into consideration at sentencing." 10 F.4th at 87. But it concluded that the district court abused its discretion by "assigning it overwhelming weight while failing to give adequate consideration to the competing goals of sentencing— including the need for the sentence to protect the public, deter criminal conduct of the defendant specifically and others generally, promote respect for the law, and reflect the seriousness of the offense committed." *Id*.

Thompson's crimes were different in kind from those in *Caesar*. But the general sentencing proposition is the same: a court must "give adequate consideration to" all the sentencing factors. *Id*. Thompson's crimes were undeniably serious and, given the amount of coverage they

received, are now infamous in cybersecurity and hacking circles. Her personal circumstances should not overshadow the other Section 3553(a) factors; they are one consideration of many for the district court to weigh at sentencing.

In this way, too, the district court's abuse of discretion mirrors the sentencing court's abuse of discretion in *Ressam*. In *Ressam*, one way the district court erred was by using the sentencing to make a political point. This Court's en banc decision specifically notes that the sentencing court made plain that it was trying to "convey" by its sentence "a message" that "our system works" and that "we did not need to use a secret military tribunal, or detain the defendant indefinitely as an enemy combatant, or deny him the right to counsel, or invoke any proceedings beyond those guaranteed by or contrary to the United States Constitution" in order to convict Ressam. 679 F.3d at 1077–1078; *see also id.* at 1078 (noting that the district court "joined the public debate over the proper place to try persons accused of being terrorists"), 1083 (noting district court's statement that the "fair treatment" at Ressam's "public trial" had encouraged his cooperation).

The district court here erred in much the same way. Under Section 3553(a), the court should have limited its consideration of Thompson's transgender status to how that aspect of her history and characteristics weighed in the sentencing calculation. But the court's comments at sentencing, and especially the "arc of justice" theme it repeatedly returned to, suggest that its sentence was unduly influenced by a desire to make a statement about the mistreatment of transgender people, not by Thompson's personal characteristics as relevant to sentencing.

\*     \*     \*

The sentence the district court imposed was substantively unreasonable and reached without rational and meaningful consideration of the sentencing factors. That result is particularly concerning in this high-profile hacking case. Rarely is it as clear from the record that a district court has focused on one sentencing consideration to the exclusion of all others. This Court should remand for resentencing.

//

//

//

63

## CONCLUSION

The Court should vacate the judgment and remand for resentencing.

September 11, 2023

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

s/*Tania M. Culbertson*
TANIA M. CULBERTSON
JESSICA M. MANCA
ANDREW C. FRIEDMAN
Assistant United States Attorneys
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101

64

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-30179

I am the attorney or self-represented party.

**This brief contains** 11,827 **words,** including 145 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Tania M. Culbertson **Date** September 11, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## STATEMENT OF RELATED CASES

To the best of plaintiff-appellant counsel's knowledge, there are no other cases pending before the Court that are related to this case.