No. 22-30179

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

PAIGE A. THOMPSON,

Defendant-Appellee.

On Appeal from United States District Court
Western District of Washington at Seattle
District Court Case No. 2:19-cr-00159-RSL

The Honorable Robert S. Lasnik
United States District Judge

## DEFENDANT-APPELLEE'S ANSWERING BRIEF

Vicki Lai
Chief Appellate Attorney
Ann Wagner
Assistant Federal Public Defender
Attorneys for Paige A. Thompson
Federal Public Defender's Office
1601 5th Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

ISSUE PRESENTED ......................................................................... 1

JURISDICTION ................................................................................ 1

STATEMENT OF THE CASE ............................................................ 1

    I.    Factual background ................................................................ 1

        A.    Ms. Thompson's history and personal characteristics ..................... 1

        B.    The offense conduct .......................................................... 5

        C.    Judge Lasnik, an experienced and highly respected jurist, presided over this case for three years, which included two detention hearings, pre-trial status conferences, Ms. Thompson's mental health struggles during her three years on pretrial supervision, two motions to dismiss the indictment, an eight-day trial, and motions for a new trial............. 8

        D.    Ms. Thompson was convicted by a jury after an eight-day trial............................................................................. 15

        E.    Sentencing .................................................................... 19

SUMMARY OF THE ARGUMENT .................................................. 30

ARGUMENT ................................................................................. 32

    I.    Standard of review ............................................................... 32

    II.    Ms. Thompson's sentence is substantively reasonable. ........................ 34

        A.    The district court thoughtfully and reasonably weighed the § 3553(a) factors.............................................................. 35

        B.    A sentencing judge's attention to a defendant's history and characteristics, including personal vulnerability to harm in prison, is required by statute and has been explicitly approved by the Supreme Court.................................................... 39

C.    Ms. Thompson's case, which involved no violence, is strikingly unlike the two terrorism cases cited by the government. ........................................................................................42

CONCLUSION ....................................................................................45

CERTIFICATE OF COMPLIANCE .......................................................46

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Farmer v. Brennan* 511 U.S. 825 (1994) ........................................................40, 41

*Gall v. United States*, 552 U.S. 38 (2007) ........................................... 32, 33, 34, 35

*Koon v. United States*, 518 U.S. 81 (1996) ................................................ 33, 34, 40

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008)........................................ 33, 34

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ........................................... 44

*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) ................................. 42, 43, 44

*United States v. Cherer*, 513 F.3d 1150 (9th Cir. 2008)....................................... 34

*United States v. Lara*, 905 F.2d 599 (2d Cir. 1990) ............................................. 41

*United States v. Mumuni*, 946 F.3d 97 (2d Cir. 2019) .......................................... 44

*United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002) ....................................... 41

*United States v. Price*, 84 F.4th 738 (7th Cir. 2023) ............................................ 41

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012)..................... 33, 42, 43, 44

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ...................................... 42, 44

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) ............................................. 35

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008).................................... 34

**Statutes**

18 U.S.C. § 1030 .................................................................................................... 7

18 U.S.C. § 3553 ..................................................................................... 35, 36, 39

## ISSUE PRESENTED

Did the sentencing judge, the Honorable Robert Lasnik, who presided over the eight-day trial and the heavily litigated case for three years, abuse his discretion when he imposed a five-year probationary sentence, including three years of home confinement, after holistically considering the positions of the parties, the purposes of sentencing, and the 18 U.S.C. § 3553(a) factors, including the personal characteristics and history of Paige Thompson, a transgender woman and first-time offender with diagnosed autism spectrum disorder, attention deficit hyperactivity disorder, and a history of mental illness?

## JURISDICTION

Ms. Thompson agrees with the government's jurisdiction statement. *See* Opening Br. at 10.

## STATEMENT OF THE CASE

### I.    Factual background

#### A.    Ms. Thompson's history and personal characteristics

##### 1.    Ms. Thompson's chaotic and abusive childhood

Ms. Thompson has been interested in computers for most of her life. She is largely self-educated, having never finished high school. 1-SER-35. As the Probation Department observed, "Paige Thompson is a complex defendant who has demonstrated resilience through a chaotic upbringing and a discrimination-

1

riddled adulthood." PSR-32. That upbringing included extensive trauma, abuse, and serious mental health struggles.

Ms. Thompson was named Trevor Allen Thompson by her parents and assigned male at birth, an assignment that caused her distress from a young age. CR 380 at 5; PSR-16, ¶ 98. Ms. Thompson's parents separated when she was young, and she has had no contact with her father since 2010. PSR-13, ¶ 73. Her mother joined the military, and Ms. Thompson's grandparents adopted her in Alabama. PSR-13, ¶ 74. When she was six years old, Ms. Thompson's mother returned to the United States and married Ms. Thompson's stepfather, who physically and emotionally abused her. The couple separated, and Ms. Thompson and her mother moved to Arkansas. Ms. Thompson's mother had several partners, many who were abusive and either alcoholic or drug users. Ms. Thompson's mother, who had been a nurse, eventually got her license permanently suspended for drug and alcohol abuse. PSR-14, ¶ 76. She also introduced Ms. Thompson to controlled substances when she was a teenager. PSR-18, ¶ 109.

Ms. Thompson attended multiple schools because "of her unstable living situation[.]" PSR-18, ¶ 112. At age 15, she attended the Northwest School of Innovative Learning in Tacoma, Washington, a school for special needs children managed through Fairfax Behavioral Health Hospital, a hospital specializing in psychiatric treatment. Her teachers reported that she stayed on task for "less than

one hour per school day and that emotional and behavior issues interfered greatly with her academic progress." *Id*. Ms. Thompson dropped out of high school after one year. *Id*.

### 2. Ms. Thompson's struggles with mental health issues as an adult, including her deterioration after her arrest

Ms. Thompson was diagnosed with gender dysphoria[1] when she was 21 years old. She is a transgender woman who presents as a woman but has not yet had gender reassignment surgery. PSR-16, ¶ 91. Ms. Thompson reported to Probation that "she had been hospitalized five or six times for emotional or psychiatric reasons, most notably in 2013, 2016, and 2019." PSR-17, ¶ 100. At the time of the filing of the presentence report, Ms. Thompson was 5'11" but weighed only 130 pounds. PSR-15, ¶ 90.

During her three years of pretrial supervision, Ms. Thompson's "mental health deteriorated and on April 29, 2020, she was placed in an involuntary 72-hour mental health hold at Harborview Medical Center. She remained there until May 5, 2020, when she was deemed stable and released." PSR-4, ¶ 6. Although she reengaged in mental health treatment, she began missing her therapy sessions "and a noncompliance memo was filed with the court on August 11, 2020." *Id*.

---

[1] Gender dysphoria is defined as a "marked incongruence between [a person's] experienced or expressed gender and the one they were assigned at birth." *See* https://www.ncbi.nim.nih.gov/books/NB532313/.

Probation reported that over the next six months, she was "generally stable"; she "struggled with her mental health, but she engaged in treatment as directed." PSR-4–5, ¶ 7. Four months before the start of trial, "Ms. Thompson continued to be compliant with pretrial supervision." *Id*. On February 11, 2022, Judge Lasnik held a status hearing over Zoom, and Ms. Thompson appeared by video. Judge Lasnik thereafter ordered that Ms. Thompson's appearance bond be amended to remove the location monitoring condition. CR 200.[2]

At her detention proceedings and again at sentencing, the defense provided a sealed psychological assessment of Ms. Thompson to the court. 2-SER-49; PSR-60. Dr. Matthew Goldenberg, an expert in transgender and gender-nonconforming mental health issues, diagnosed Ms. Thompson with several serious mental health conditions, including major depressive disorder and attention deficit/hyperactivity disorder. PSR-16, ¶ 96; 2-SER-49. On August 5, 2022, Grace Iarocci, Ph.D., diagnosed Ms. Thompson for the first time with autism spectrum disorder, "'a condition that affects all aspects of a person's development." PSR-16, ¶ 99; PSR-42. Before her arrest and after her eventual release from pretrial detention,

---

[2] CR refers to docket entries filed in the district court.

Ms. Thompson was under the care of a Seattle Counseling Service[3] psychiatrist, who also managed her medications. PSR-17, ¶ 101.

### B. The offense conduct

Computers were Ms. Thompson's salvation from her mental health struggles. Despite having no formal education, Ms. Thompson has an aptitude for programming and computers, which she developed from an early age after inheriting an old computer when she was eight or nine years old. PSR-14, ¶ 78. Although self-taught, she obtained employment at several technology companies as a software engineer, including at Amazon Web Services (AWS) from 2015 to 2016. 1-SER-10–11. AWS provides "cloud services" that allow companies to rent or contract to use "virtual computers" from Amazon. 1-SER-6.

From March to June 2019, while unemployed, Ms. Thompson created proxy scanners[4] using common software tools that allowed her to identify AWS servers with misconfigured web application firewalls. Because those firewalls were misconfigured by the complainant companies to act as open forward proxies allowing public access, Ms. Thompson was able to communicate with the firewalls to obtain security credentials for particular accounts or roles, allowing her to

---

[3] Seattle Counseling Service, which closed its doors in 2022, provided mental and behavioral health support and therapy for people in the LGBTQ+ community. PSR-17, ¶ 101.

[4] A proxy scanner is a tool for searching through a range of Internet addresses.

retrieve data stored by the companies on AWS's cloud storage service, including millions of Capital One's customers' personal identifying information, and to copy and download that data onto her computer. 3-ER-53. In addition to allowing downloads, some of the companies' servers also allowed Ms. Thompson to use their computing power, which she used to mine about $10,000 worth of cryptocurrency. 1-SER-16–28; 1-SER-29–32.

On July 17, 2019, Capital One learned of the misconfiguration of its firewall after Kristen Valentine, a cybersecurity professional, alerted Capital One. She emailed the bank about the private direct messages she received on her Twitter account from a woman she did not know, someone with the Twitter username "Erratic," stating she was going to "dox" or "drop information" about herself. 3-ER-451–52. The messages contained a link to a coding website called "Github." 3-ER-453. Because Ms. Valentine did not know the person who sent the direct messages and viewed doxing oneself as "neutral" rather than negative, she did not report the messages to anyone for two weeks. 3-ER-455–56. Although the Github link had Ms. Thompson's name associated with it, Ms. Valentine stated the person was a stranger to her. *Id*. Ms. Valentine testified she later viewed the messages as a cry for help. 1-SER-7.

After viewing the link, Ms. Valentine emailed Capital One and forwarded the Github link, which directed the viewer to a list of the company's virtually

stored data. 3-ER-456. Capital One quickly identified a misconfiguration of its web application firewall and "replaced the [web application firewall] with a new one, which was a project that had already been underway." 3-ER-486. Because Ms. Thompson did not hide and used her full name—Paige Adele Thompson— Capital One readily identified Ms. Thompson as the person behind the Github account. 3-ER-490. Capital One notified law enforcement on July 20, 2019, 1-SER-10–11, and Ms. Thompson was arrested after the FBI served a search warrant on her home. 3-ER-586, 588.

After her arrest, Ms. Thompson voluntarily met with the government and explained how she obtained the data through the complainant companies' misconfigured web application firewalls. PSR-9, ¶ 39. She was charged by complaint with computer fraud in violation of 18 U.S.C. § 1030(a)(2). CR 1. The grand jury later returned a ten-count second superseding indictment charging Ms. Thompson with one count of wire fraud, several counts of violating the Computer Fraud and Abuse Act (CFAA), one count of access device fraud, and one count of aggravated identity theft. 2-ER-211–21.

There is no evidence that Ms. Thompson shared Capital One's data, and no credit card account numbers or log-in credentials were disseminated. 3-ER-556; *see also* Opening Br. at 65 (acknowledging that Ms. Thompson's case differs from other prosecutions because she did not monetize the data she obtained from Capital

One). Outside of Capital One, her offenses caused little in monetary damage to any entity. One of the complainant companies, 42 Lines, admitted to the government that "[t]he truth is that there was zero impact on 42 lines from the intrusion in question, and the only negative impact on us has been through my time spent on the trial and the negative publicity from being associated with the trial[.]" CR 380, Ex. 7. Similarly, Christopher Chan, the SVP of engineering and operations for Bitglass, another complainant company, testified that the files downloaded by Ms. Thompson did not contain "a lot of data" and "had no value externally other than internal operational use." 4-ER-633.

C.   **Judge Lasnik, an experienced and highly respected jurist, presided over this case for three years, which included two detention hearings, pre-trial status conferences, Ms. Thompson's mental health struggles during her three years on pretrial supervision, two motions to dismiss the indictment, an eight-day trial, and motions for a new trial.**

Judge Lasnik has been a respected federal district court judge for the Western District of Washington since 1998. 1-ER-11. Before his appointment to the federal bench, he was a state superior court judge and a King County prosecutor. His legal career spans 45 years. *Id*. Because Judge Lasnik's experience with the case over its more than three-year span was important to his judging the information that would shape his sentencing decision, and the court's experience with the case is significant on appeal, the history of the case is relevant to whether the court abused its discretion in sentencing Ms. Thompson.

However, in its "Statement of the Case[,]" the government presents a myopic view of that history by focusing on brief remarks made by Judge Lasnik in his oral and written pretrial rulings, stating these "passages" "reflect the district court was focused on sentencing considerations at an early stage of the case." Opening Br. at 25. Because isolated statements by Judge Lasnik without context are not representative of the full history of this case, Ms. Thompson provides further context below.

      **1.**     **Judge Lasnik presided over Ms. Thompson's detention-review hearing, in which the defense presented, among other evidence, a report from a licensed psychologist and an expert in transgender mental health issues, addressing the dangers of detaining Ms. Thompson in a pretrial male facility.**

The government correctly notes that Ms. Thompson's 2019 detention-review proceedings were the first substantive matter over which Judge Lasnik presided. Opening Br. at 24. At the initial detention proceeding, the defense had provided the magistrate judge with a sealed evaluation conducted by Dr. Matthew Goldenberg, a licensed psychologist with expertise in transgender and gender non-conforming mental health issues. 2-SER-49. In that report, Dr. Goldenberg noted that Ms. Thompson presented as female and "has developed breasts and her skin and hair are softened due to her medications." 2-SER-53. Dr. Goldenberg opined that "[t]he risk of being continuously misgendered and becoming a target for intimidation by other inmates is likely in a male facility" and that "[l]ong-term

9

placement in a men's facility will likely increase Paige's gender dysphoria, depression, and risk of suicide." 2-SER-54. Because of these dangers, Dr. Goldenberg recommended that Ms. Thompson be moved "as soon as possible" to a halfway house to allow her to continue with mental health treatment and that "[i]n terms of optimal mental health care, Paige should be seen at an agency that is specifically suited to work effectively with transgender people because transgender people face a unique set of mental health challenges as well as quality of life impairments not seen in other populations." 2-SER-55.

The defense also presented a letter from Chase Strangio, an attorney who has represented transgender individuals incarcerated in prisons and jails across the country on behalf of the American Civil Liberties Union's LGBT & HIV Project since 2013. Mr. Strangio advised the court that Ms. Thompson faced "an exceedingly high risk of sexual abuse and harassment while in custody" in a pretrial facility and that "transgender women incarcerated in men's prisons remain among the most vulnerable class of prisoners." 1-SER-46.

The magistrate judge ordered Ms. Thompson detained in August 2019. The government had argued that Ms. Thompson's lack of community ties and serious mental health issues, including prior suicidal ideation, made her a flight risk. The magistrate judge agreed, finding in part that Ms. Thompson "has a history of serious mental health issues that have resulted in erratic, bizarre behavior and both

suicide ideation and a suicide attempt." 2-ER-225. The magistrate judge found noteworthy that "[a]t Defendant's last court hearing, she stated multiple times that she just wanted to die" and that she had made threats on social media about killing herself and others. *Id*.

The defense asked Judge Lasnik to review the detention order. CR 44. The defense argued the government had not met its burden of showing that Ms. Thompson was a serious flight risk, pointing to her ties to the local community, which included supportive friends and "specialized treatment providers who aid and assist transgender persons in the Seattle area." CR 44 at 8. The defense also addressed the government's concerns about Ms. Thompson's mental health history and previous threats of self-harm, citing in part to Dr. Goldenberg's opinion that Ms. Thompson's mental health would worsen if detained in a male facility without regular access to her treatment providers. CR 44 at 11. In addition, the defense pointed out that both Capital One and the government had made public statements reassuring the public that they had no information that Ms. Thompson had '"monetized the data in any way.'" CR 44 at 13–14. And the same held true for the other companies alleged to have been affected. CR 44 at 14.

In its recitation of this history, the government selects isolated remarks made by Judge Lasnik from the 33-page transcript of that hearing as evidence that "he

already had views about the case." Opening Br. at 24. That Judge Lasnik had

developed "views about the case" after reading from and listening to the parties'

submissions is not surprising nor inappropriate given his role as a judge. More

problematically, the government does not provide the context for the court's

statements. For example, the government finds noteworthy Judge Lasnik's

observation that "transgender people have been 'demonized in society.'" Opening

Br. at 24 (citing 3-ER-3530). But the court's observation was responding to the

government's position throughout the detention hearing and in its pleadings that

detaining Ms. Thompson in a male unit at the Federal Detention Center was

appropriate despite the heightened danger posed to her as a transgender woman.

*See*, *e.g.*, 3-ER-357 (prosecutor argued: "transgender creates a lot of issues, it

creates difficulties other people don't have. But with that proviso, the situation

Ms. Thompson is in is really the situation that a lot of people find themselves" who

have been charged with a crime).

Judge Lasnik acknowledged the government's counter arguments, telling the

prosecutor that "I agree with everything you said," but observing that "being a

transgender person in our society already puts you at tremendous risk of harm[.]"

3-ER-352. It was in this context that Judge Lasnik noted that transgender people

face unique dangers because they are demonized in society. However, Judge

Lasnik specifically asked the prosecutor for his views regarding the Bureau of

Prison's ability to "cope with transgender people," asking him: "What do you think? Have you talked to them? What can you tell me about that?" 3-ER-354.

> **2.    The defense moved to dismiss the CFAA and the wire fraud counts, arguing the superseding indictment failed to state a claim because the government could not prove, as a matter of law, that Ms. Thompson's access to AWS's servers was "without authorization"—an element of the CFAA—and that Ms. Thompson had the specific intent to defraud the victims of money or "property."**

The government also asserts that "[p]assages in other pretrial rulings reflect that the district court was focused on sentencing considerations at an early stage of the case." Opening Br. at 25.

The defense filed two motions to dismiss based on legal rather than factual arguments.[5] The first moved to dismiss the wire fraud and the access device fraud and aggravated identity theft counts. Regarding the wire fraud count, the defense argued that the first superseding indictment failed to state a wire fraud offense because Ms. Thompson's use of legal technical processes to access the misconfigured firewalls did not constitute a misrepresentation nor could the government show she possessed the specific intent required under the statute to deceive and cheat the companies out of "property," since what she obtained from

---

[5] Oral argument was granted by Judge Lasnik. CR 212.

the complainant companies did not constitute "property" under the wire fraud statute. CR 122 at 5. Judge Lasnik denied the motion in a 16-page written order.

In a second motion to dismiss, Ms. Thompson argued that the CFAA counts should also be dismissed because, as a matter of law, the government could not prove that she accessed AWS's rented servers "without authorization" as required by the CFAA. CR 123. Specifically, citing to Supreme Court law, Ms. Thompson argued that because the entities' firewalls were misconfigured, she received automatic authorization when the misconfigured servers provided her with credentials in response to her legitimate commands. CR 123 at 6. The court denied this motion as well, in a 14-page written order, concluding that "[a]ny argument that mistake or technological process rendered defendant 'authorized' is properly resolved by the trier of fact." CR 226 at 6.

From this lengthy record, the government highlights in its "Statement of the Case," two "passages" that it states shows the "district court was focused on sentencing considerations at an early stage of the case"—both one-sentence footnotes that hardly constitute the "focus[]" of the order. Opening Br. at 25. The government first points to Judge Lasnik's brief footnote in his order denying Ms. Thompson's motion to dismiss the wire fraud count, making the unremarkable point that although Ms. Thompson's lack of monetization was irrelevant to the defense's motion, it "could, of course, have a significant impact at sentencing." *See*

3-ER-204 (the entire footnote states: "Although it could, of course, have a significant impact at sentencing.").

The second statement the government highlights is equally brief. In rejecting the defense's motion to dismiss the CFAA counts, Judge Lasnik declined to address Ms. Thompson's counterfactual hypothetical that had she "acted less erratically (rather than a person who has struggled her entire life with mental illness and her gender identity"), she might not have been charged. 2-ER-191–92. In response, Judge Lasnik noted in a one-sentence footnote that "[w]hile this is not a decisive point for deciding this Motion to Dismiss, it would be an important factor at sentencing." 2-ER-192. Pointing out that Ms. Thompson's mental illness and gender identity could be considered at sentencing is not only appropriate but also correct.

### D. Ms. Thompson was convicted by a jury after an eight-day trial.

The highly technical and complex case against Ms. Thompson began on June 7, 2022. During the eight-day trial, the government called 16 witnesses, including cyber security representatives from Capital One, AWS, and other complainant companies, various FBI computer experts including a FBI Cyber Squad tactical intelligence analyst, a FBI Cyber Squad computer forensic examiner who was the agent for Ms. Thompson's case, and a FBI computer scientist, who testified about the steps Ms. Thompson took to get into the complainant

companies' servers based on what he found on her computer. 4-ER-690–5-ER-856. The government's computer expert explained that Ms. Thompson accessed 37 million IP addresses associated with AWS from the public-facing Amazon documentation that provides these IP addresses. 5-ER-741.

The government mostly agreed with the defense about the technical mechanics of how Ms. Thompson accessed AWS's servers but emphasized that the companies did not intend for her to have access and thus she acted without authorization. The government acknowledged that Ms. Thompson accessed publicly available IP addresses. Steve Schuster, director of security incident response at AWS, also agreed that the firewalls were "misconfigured" by the client companies but characterized the companies' misconfigurations of their firewalls as trickery on Ms. Thompson's part. 3-ER-406–47. According to Mr. Schuster, "once [Ms. Thompson was] able to look for that configuration of the firewall, they were then able to trick that firewall into querying the Instance Metadata Service to give—to give role credentials that could be assumed by the firewall." 3-ER-406. When asked by the prosecutor what he meant by the word "trick," Mr. Schuster responded: "[b]ecause the firewall wasn't set up—the firewall was misconfigured." 3-ER-405. According to Mr. Shuster, while each step taken by Ms. Thompson was "relatively well-known[,]" her ability to combine those steps to access the internal

16

resources was not. 3-ER-426. His view was that no other person had done what Ms. Thompson was able to do. *Id.*

The government argued that the companies did not want Ms. Thompson to have access, emphasizing that "each of the witness companies was asked the question . . . : 'Did [company] intend for [Ms. Thompson] to have access to its code and all of its data'" with all responding in the negative. 1-SER-39–40. The defense's theory was that the companies' subjective intent in programming their web application firewall interfaces did not affect whether Ms. Thompson's access of those interfaces was "without authorization" as that technical statutory phrase is interpreted by the case law—an element of the crime under the CFAA.

Ms. Thompson's theory on the wire fraud count was that the companies had configured their web application firewalls to grant overly permissive access to the public, which allowed her to access the systems from outside their network and thus there was "no false representation of a material fact." 1-SER-42–43, 44. The government countered that Ms. Thompson falsely represented herself by "tricking the [companies'] firewall" to get the "firewall to pass the message" forward to AWS's service and thereafter pass the information back. 1-SER-39. The prosecutor asserted that Ms. Thompson got AWS to respond to her external requests by "impersonating the firewall[.]" 1-SER-39. And, once she obtained the credentials and used them, she was "representing that she is a person who should have those

credentials," and "that's the trickery, that's the misrepresentation." *Id*. In addition to allowing downloads, some companies' servers permitted Ms. Thompson to use their computing power. Ms. Thompson used this computer power to mine cryptocurrency. She obtained just over $10,000 in cryptocurrency. 1-SER-16–28; 1-SER-29–32.

On June 17, 2022, the jury convicted Ms. Thompson of the wire fraud and CFAA counts (Counts 1–2 and 4–8) and acquitted her on the access fraud and aggravated identity theft counts (Counts 9–10). CR 335. After the verdict, Judge Lasnik addressed Ms. Thompson with his trademark compassion. He first explained to Ms. Thompson that because she was acquitted of the aggravated identity theft count, "[t]here's no mandatory minimum term." 5-ER-1062–63. He noted she had legal issues for appeal and that "[i]t's not the end for you in any way, shape, or form." *Id*. Judge Lasnik further encouraged Ms. Thompson to "stay focused on being healthy and well," and stated "[y]ou have all your life ahead of you. You are a remarkable person, and we got to see that. I really need you, though, to believe in yourself and believe in your lawyers going forward. Don't quit on yourself, okay?" *Id*.

### E.    Sentencing

#### 1.    The parties' sentencing memoranda and Probation's sentencing recommendation, which included an alternative sentencing recommendation involving no additional incarceration

Both parties and Probation agreed that a Guidelines sentence was inappropriate for Ms. Thompson and that a substantial downward variance was warranted. They differed only as to the degree of that variance.

The government submitted a 26-page sentencing memorandum. The government agreed with Probation that the total offense level was 37[6] with no deduction for acceptance of responsibility, and because Ms. Thompson had no criminal history that she was in criminal history category I. Probation and the government calculated Ms. Thompson's Guideline sentencing range as 210 to 262 months' imprisonment. CR 377 at 13; PSR-12, ¶ 64.

The government, however, recommended that the court impose a non-Guideline sentence of seven years or "less than half of the low end of the standard range" as calculated by the government and Probation. CR 377 at 4. The government recognized a Guideline sentence was inappropriate for Ms. Thompson

---

[6] The government agreed with Probation that the base offense level was 7, with a 22-level upward adjustment for a loss of more than $25 million, a 2-level upward adjustment for an offense affecting ten or more victims, a 2-level upward adjustment for an offense involving sophisticated means, and a 4-level upward adjustment for being convicted of an offense under 18 U.S.C. § 1030(a)(5)(A). 2-ER-126.

because a Guideline sentence was "appropriate for a person with purely malicious motives who committed maximum harm." *Id*. The government explained that "[a] significant downward variance is appropriate to recognize that Thompson could have caused more harm than she did, that her decision-making was influenced by her mental health circumstances, trauma, and lack of a robust support system, and that there are widely recognized medical, mental, and physical risks she will face in prison as a transgender woman." *Id*. However, the government asserted a term of imprisonment was necessary to "recognize the seriousness of the offense and deter Thompson and others engaging in similar conduct." *Id*.

In its presentence report, Supervising United States Probation Officer Amelia Whaley stated that "[i]n contemplating a sentence outside of the advisory guideline system, the Court may wish to consider that the guideline offense level based upon loss amount may overstate the defendant's culpability in this case." Probation Officer Whaley also informed the court that it "may also wish to consider Ms. Thompson's gender identity and the extraordinary difficulty that she may experience serving a custodial sentence, her compliance and stability on pretrial supervision, and her unstable and difficult childhood." PSR-21, ¶¶ 142, 143.

Probation Officer Whaley recommended a custodial sentence of 24 months followed by three years of supervised release, stating that a sentence "approaching

the guideline range would be unjust." Addressing public safety, deterrence, and treatment, Probation Officer Whaley commented that "[g]iven her apparent disinterest in either monetizing the breach or in notifying the companies of their vulnerabilities," the "crime seems to be one of curiosity and opportunity." PSR-36. The officer found noteworthy that Ms. Thompson "has made significant progress in her personal life since the time of this offense. When she participated in this conduct, Ms. Thompson was depressed, isolated, lonely, bored, and unable to find work" but that "[t]his is no longer Ms. Thompson's reality." *Id*. The officer described Ms. Thompson as having a "huge amount of potential" and stated that "deterring Ms. Thompson has less to do with sending her to prison and more to do with assisting her in finding appropriate employment, maintaining her stable mental health, and monitoring her conduct as she navigates this new stage in her life." PSR-37.

Probation also provided an alternative sentencing recommendation. Probation Officer Whaley acknowledged that although this was not Probation's usual practice, "given the extenuating circumstances in this case, it appears appropriate to offer an additional option." *Id*. The officer explained that "it would be irresponsible to ignore" the fact that Ms. Thompson is transgender, "that she has been taking feminizing hormones for nearly fifteen years; she looks like a woman and presents as a woman" but "has not had gender-reassigning surgery." *Id*.

Because it was not guaranteed Ms. Thompson would be housed with women, the officer noted the concern that Ms. Thompson faced the real possibility of being housed with male prisoners, which would result in her either being subjected to protective solitary confinement or extreme danger—neither of which was acceptable. PSR-38.

Weighing the concern for Ms. Thompson's mental and physical safety with sending the wrong "message to the community that transgender individuals may be above the law[,]" the officer alternatively recommended that Ms. Thompson "be sentenced to time served and 5 years of probation, to include 36 months of home incarceration." *Id*. Probation Officer Whaley pointed out that "[a] probationary sentence, unlike supervised release, can be retributive in nature and utilized to satisfy the punitive purpose of sentencing found at 18 U.S.C. § 3553(a)(2)(A)" and that Ms. Thompson would face resentencing if she violated the terms of her probation. *Id*.

The defense recommended a sentence of time served (Ms. Thompson was in federal custody for almost 100 days before her pretrial release) followed by three years of supervised release. While acknowledging the seriousness of her conduct, the defense argued in part that Ms. Thompson, who also has been diagnosed with autism and ADHD, "is at serious risk of verbal, emotional, sexual, and physical

22

victimization" if she were to be incarcerated, "a risk that non-transgender inmates *can* face, but which Ms. Thompson will *almost certainly* face." 2-ER-103.

### 2. The sentencing hearing

As the government points out, Judge Lasnik began the sentencing with a quotation from Dr. Martin Luther King: "'The arc of the moral universe is long, but it bends toward justice.'" 1-ER-10. He reflected on how the system had changed for the better in his 45-year legal career. 1-ER-11. He pointed to there being greater diversity in the entire criminal justice system in "gender and race," noting for example that when he began as a district court judge in 1998, "the probation department was almost exclusively white male; and they considered themselves an extension of law enforcement." 1-ER-14–15. After speaking about how the criminal justice system has benefitted by having different voices and perspectives, Judge Lasnik explained his reason for introducing Dr. King's quote: to acknowledge the difficulty of the case and the efforts of everyone involved to serve justice:

> So I'm using this as a way of introducing the fact that we have a very difficult and challenging sentencing this morning. And every single person who has weighed in on this case, has done so with integrity, with a sense of justice in mind, and has done a remarkable job of advocating for their positions.

1-ER-17.

Judge Lasnik further remarked that he was "very hopeful that people look at this and say: This is the system at its finest, and this is a system where reasonable people may disagree about what the result is, but it was done with great integrity, great dignity, and great concern for justice." *Id*. Judge Lasnik explained that before getting "to the nitty-gritty of what the right result is," he simply wanted to "extend his appreciation to all the lawyers for what they did, and all the staff people, law enforcement, probation, et cetera, for what they did in this case." 1-ER-17–18.

The court then heard from the parties. 1-ER-18–54. The government acknowledged that Ms. Thompson had made a truthful proffer after her arrest but argued she nonetheless was not entitled to an acceptance of responsibility adjustment because she had not shown sufficient contrition. 1-ER-23. Calculating the sentencing range as 210 to 262 months without an adjustment for acceptance of responsibility, the government recommended a non-Guideline sentence of seven years' imprisonment, "approximately a third of the range recommended by the guidelines." 1-ER-24. The government argued that while a substantial variance was appropriate, a custodial sentence was warranted because the case involved "a massive computer hack" with a large financial impact on Capital One. 1-ER-25. The government acknowledged that "Ms. Thompson did not monetize" the information but argued that people nonetheless suffered "strain and frustration" from having their information taken. 1-ER-27.

24

The government also criticized Ms. Thompson for going "to trial basically with a false narrative" by making the legal claim through her lawyers that she did not intentionally access a computer "without authorization" under the CFAA. 1-ER-33.[7] The government argued Ms. Thompson's legal defense had "suggest[ed] or confirm[ed] that Ms. Thompson knew this wasn't okay." 1-ER-34. Judge Lasnik responded directly to that argument, noting that there were "decent legal issues that might prevail on appeal"—a legal gray area as to whether Ms. Thompson's conduct truly met the statutory definition of the crimes. 1-ER-36. He refused to fault her or her attorneys for taking the case to trial or preserving those arguments for appeal. *Id.* The court explained:

> It's not their burden to plead guilty to save the victims embarrassment. They were trying to do the best they can for their client, and they legitimately saw some decent legal issues that might prevail on appeal.[8]

---

[7] Ms. Thompson first made this legal argument in her motion to dismiss certain CFAA counts. The district court denied that motion but specifically stated in its order that "[t]o the extent defendant wishes to argue that her access method was authorized, *such arguments should be raised to the trier of fact*." 2-ER-187 (emphasis added). The court further stated that "[t]he question of whether accessing a server that is not meant to be public (unlike a public facing website) but nonetheless lacks protective authentication requirements constitutes acting 'without authorization' under the CFAA therefore exists in a gray area" but that the court "need not resolve this question" on a motion to dismiss. 2-ER-188. Instead, the court correctly instructed that "this argument is properly made to the trier of fact." *Id*.

[8] The undersigned counsel filed a notice of appeal of the CFAA and wire fraud convictions and filed an opening brief, and the government filed a cross-appeal of

The government also pointed to Ms. Thompson's conduct during her pretrial supervision (although the court-imposed supervised released conditions addressed future conduct). The government pointed out that positive changes had been made regarding placement for transgender individuals but admitted "where [Ms. Thompson] is ultimately designated, what kind of institution, is yet to be determined. But it could be a male, it could be a female institution. It could be one, and changed to the other. So it's something BOP is sensitive to. We don't have certainty about what will happen in this case." 1-ER-42.

The government concluded that a Guideline sentence was "not appropriate, given the facts of the case, and it's not necessary for deterrence" but that the defense's and Probation's recommendations were not high enough to punish Ms. Thompson and to deter others. 1-ER-44.

After defense counsel advocated for a probationary sentence, Ms. Thompson made a brief statement, noting her recent autism spectrum disorder diagnosis, and telling the court that she wants to be "gainfully employed again, and contribute something meaningful to the world." 1-ER-55. Counsel responded in the

---

the sentencing. Dkt. 12, Nos. 22-30168 & 22-30179. Regarding the CFAA counts, Ms. Thompson raised a sufficiency of the evidence challenge, arguing no rational trier of fact could have found that Ms. Thompson "intentionally accessed without authorization a computer" under Supreme Court law. *Id*. Ms. Thompson voluntarily moved to dismiss the appeal for reasons unrelated to the merits. This Court granted the unopposed motion on August 14, 2023. Dkt. 18.

affirmative when the court inquired whether Ms. Thompson's absence of an acceptance-of-responsibility letter was due to her possible appeal, and explained that she also wanted to address the court orally. 1-ER-55. Ms. Thompson thereafter expressed that she was "very sorry about this." *Id*.

Judge Lasnik stated his findings. While acknowledging it was a "close call," he applied the two-point deduction for acceptance of responsibility. He agreed with Probation's offense-level calculation based on a $40 million loss amount. Applying the two-point deduction, Judge Lasnik calculated the Guideline range as 168 to 210 months' imprisonment. 1-ER-56. In rendering his sentencing decision, Judge Lasnik spoke about his discretion "to do justice in individual cases" while acknowledging that "the question of what is justice here is a really, really hard question." 1-ER-58. The court was careful to recognize that Ms. Thompson had committed a "terrible crime" but also agreed with the defense that the fact there was no evidence the information obtained was monetized mitigated the "terrible" nature of the crime. 1-ER-59.

Judge Lasnik also noted that Ms. Thompson "made some attempts to reach out to Ms. Valentine, to get somebody to help" and that "ultimately she was caught before she did anything bad or anything good." 1-ER-59. He also raised the concern that some of the loss amount attributed to Ms. Thompson would have been incurred whenever the misconfiguration of the servers was identified, regardless of

whether there was a CFAA violation or a responsible disclosure of the
vulnerability through a program such as Capital One's or AWS's formal disclosure
programs. 1-ER-29.

The court further stated that the "treatment of transgender defendants in the
criminal justice system" was a "tough one" and that while the Bureau of Prisons
has established a taskforce, there remained "issues with placing transgender
women, who still have male genitalia, into women's prisons." 1-ER-59. The court
found relevant that "the time that a transgender person serves in prison is going to
be difficult, for sure, under any circumstances." *Id*. The court, however, stated that
"dealing with Paige Thompson, what she did, who she is, is the dilemma before the
court today." 1-ER-60.

After speaking at length, Judge Lasnik rejected both the defense's
recommendation of a time-service sentence and the government's seven-year
custodial recommendation, and instead followed the alternative approach set out by
Probation. He thus imposed a sentence of time served on Count One (wire fraud)
since probation was not available for that count. On the other counts, the court
imposed a five-year term of probation, placing Ms. Thompson on home detention
with location monitoring for three of those five years. 1-ER-61. The court also
imposed 50 hours of community service per year during the five-year probationary
period. 1-ER-64. Strict conditions were also imposed upon Ms. Thompson

including Probation's ongoing monitoring of her computers and any electronic devices and media; quarterly polygraph testing at her expense; her providing Probation notification of any computer software owned or operated by her; her providing Probation with access to any requested financial information, including the authorization to conduct credit checks and obtain copies of her tax returns; and expansive search conditions. 1-ER-61–64.

Judge Lasnik concluded by noting that although ten judges viewing the case might have arrived at ten sentences different from his own, this "was his sentencing," and he was in the best position to sentence Ms. Thompson because he had presided over her trial, heard the testimony, and seen Ms. Thompson evolve over three years:

> And as I indicated at the beginning, this is my sentencing. Ten judges might come up with ten different sentences, in this situation. Some of them would have been seven years in prison. Some of them might have been two years in prison. Maybe one of them might have been credit for time served.

> But I heard this trial. I heard the testimony. I've seen Ms. Thompson evolving, over the three years since we started. I believe the Autism Spectrum Disorder determination also makes sense, for some of her behavior, along with the ADHD, and the trauma that she suffered as a child, and suffered into her teens and young adulthood.

1-ER-65.

Finally, Judge Lasnik addressed public safety concerns, stating that "I'm also confident to put my reputation on the line and say, I do not believe Paige

Thompson will reoffend. And if that does happen, she'll be in violation of her probation, and I'll deal with it, and I'll admit my mistake. But I believe in her, and I believe that she will prove that this was the right sentence, going forward." 1-ER-65.

## SUMMARY OF THE ARGUMENT

The government's appeal rests not on any substantive failures by Judge Lasnik, a well-respected jurist with over 30 years of experience as a judge, but on its disagreement with his decision to sentence Paige Thompson to a non-custodial sentence. The court took a measured and thoughtful sentencing approach, which was not unmindful of the concerns raised by the government. Indeed, the record makes clear the court considered the government's concerns but simply disagreed that seven years of imprisonment was appropriate for Ms. Thompson, a visibly frail transgender woman who has struggled since childhood with substantial mental health issues, including a recent autism spectrum disorder diagnosis. As Judge Lasnik observed, ten judges might have come up with ten sentences in this very difficult case, but, having sat through the eight-day trial and observing, talking to, and judging Ms. Thompson for three years, he was in a superior position to decide the appropriate sentence. The court's sentence reflects the knowledge and understanding it acquired during the years that preceded imposition of its sentence.

On appeal, the government asks this Court to second-guess Judge Lasnik, reducing his rationale for his sentencing decision to one factor—Ms. Thompson's "status as a transgender woman"—despite a record that shows otherwise. That Judge Lasnik attached hefty weight to Ms. Thompson's risk of physical and psychological harm from a prison sentence was reasonable, particularly given the government's concession that there were no guarantees she would not be placed in a male facility, although she looks like a woman and presents as a woman but has not had gender-reassignment surgery. Moreover, nothing in the record supports the government's assertion that Judge Lasnik focused only on "one Section 3553(a) factor . . . (in particular, her status as a transgender woman)" without considering the other § 3553(a) factors. Opening Br. at 50.

Among other considerations, Judge Lasnik made clear he viewed Ms. Thompson's offense as "a terrible crime" but that mitigating factors distinguished her offense from other similar offenses, including the fact that Ms. Thompson had not monetized the personal data she downloaded, which both diminished her culpability and distinguished her from similarly situated defendants. He also thought deeply about public safety, expressing his confidence and his reputation that Ms. Thompson would not reoffend but that, if she did, she would violate her probation and be subject to punishment. He also imposed multiple special conditions of supervised release that strictly monitored her

31

computer use. And the district court considered deterrence given that he imposed three years of home confinement, an extended term of probation, and ordered Ms. Thompson to pay $41 million in restitution.

On this record, it was reasonable for the court to decide a non-custodial sentence was warranted by the circumstances and that imprisonment was unnecessary to deter Ms. Thompson from future criminal conduct or to protect the public from her future criminal acts. The government provides no precedent supporting its argument that a probationary sentence—imposed for crimes similar to Ms. Thompson's on a defendant with no criminal history—is substantively unreasonable. The two cases cited by the government involving "horrific" terrorism-related crimes are materially different and offer no support for the government's position that this is one of the rare cases where the sentence is unsupportable as a matter of law.

This Court should reject the government's call for an essentially de novo review of Judge Lasnik's sentence. *Gall v. United States*, 552 U.S. 38, 59 (2007) ("[I]t is not for the Court of Appeals to decide de novo whether the justification for a variance is sufficient or the sentence reasonable.").

## ARGUMENT

### I. Standard of review

"Ordinarily, when a sentence is appealed, '"[the Court] first consider[s] whether the district court committed significant procedural error, then we consider

32

the substantive reasonableness of the sentence.'" *United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) (en banc) (citing to *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc)). "It would be procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range; to treat the Guidelines as mandatory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range." *Carty*, 520 F.3d at 993. None of these errors have been alleged nor does the record show procedural error.

Here, the government's only argument on appeal is that the district judge's five-year probationary sentence is substantively unreasonable. The government makes clear in its opening brief that it raises only a substantive challenge, stating that "[t]his Court must reverse a sentence if it is either procedurally erroneous (*a claim not raised in this appeal*) or substantively unreasonable." Opening Br. at 48 (emphasis added). Thus, the only question before the Court is whether Ms. Thompson's sentence is substantively reasonable under "the familiar abuse-of-discretion standard of review." *Gall*, 552 U.S. at 46. *See also Ressam*, 679 F.3d at 1085 ("As the government has decided to focus solely on the substantive reasonableness of the sentence, we elect to do the same.").

Under the deferential abuse-of-discretion standard, this Court "may not reverse just because [it] think[s] a different sentence is appropriate." *Carty*, 520 F.3d at 993. "Even if we are certain that we would have imposed a different sentence had we worn the district judge's robe, we can't reverse on that basis." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam). After all, "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, knows the facts and gains insights not conveyed by the record." *United States v. Cherer*, 513 F.3d 1150, 1160 (9th Cir. 2008).

## II.    Ms. Thompson's sentence is substantively reasonable.

As the United States Supreme Court has repeatedly emphasized, "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. Judge Lasnik acknowledged that different jurists could have arrived at different sentences in this complex case: "And as I indicated at the beginning, this is my sentencing. Ten judges might come up with ten different sentences, in this situation." 1-ER-65. His role, as he correctly understood it, was to exercise his unique perspective as someone who "heard this trial," "heard the testimony," and "s[aw] Ms. Thompson evolving, over the three years since we started." *Id.* In short,

Judge Lasnik recognized that the exercise of discretion means selecting from among the contrasting perspectives presented by the parties; and that residual disagreement about the sentence is a core feature of the advisory Guidelines, not a fault. His weighing of the § 3553 factors at sentencing more than supports his exercise of that discretion in this case. *See United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) (quoting *Gall*, 552 U.S. at 59) (emphasis added) ("The clear message in *Gall* . . . is that [this Court] must defer 'to the District Court's reasoned and reasonable decision that the § 3553(a) factors, *on the whole*, justified the sentence.'"); *id*. ("[I]t is the reasoned decision itself, not the specific reasons that are cited, that triggers [the] duty to defer.").

### A.    The district court thoughtfully and reasonably weighed the § 3553(a) factors.

Contrary to the government's characterization of the § 3553 analysis, Judge Lasnik explicitly discussed multiple § 3553 factors that contributed to his determination of an appropriate sentence, including the nature and circumstances of the offense, the seriousness of the offense, specific and general deterrence, and the need to protect the public. Furthermore, that he saw "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), differently from the way the government sees it is a classic exercise of discretion, not an abuse of it. There is no indication in the record that Judge Lasnik considered Ms. Thompson's status as a

transgender woman as the sole determinant of an appropriate sentence; rather, *both* parties and Probation urged him to take this consideration into account, and he did.

As to the nature of the offense and its seriousness, § 3553(a)(1), (a)(2)(A), Judge Lasnik was careful to explain that he considered Ms. Thompson's offense "a terrible crime." 1-ER-59. At the same time, he noted several significant issues that distinguished this crime from other, similar crimes. First, he raised the concern that some of the loss amount attributed to Ms. Thompson would have been incurred whenever the misconfiguration of the servers was identified, regardless of whether there was a CFAA violation or a responsible disclosure of the vulnerability through Capital One's or AWS's formal disclosure programs. 1-ER-29. Second, he noted that there were "decent legal issues that might prevail on appeal"—a legal gray area as to whether Ms. Thompson's conduct truly met the statutory definition of the crimes. 1-ER-36. He refused to fault her or her attorneys for taking the case to trial or preserving those arguments for appeal. *Id.* Finally, he noted that Ms. Thompson had not monetized the personal data she downloaded, and this both diminished her culpability and distinguished her from otherwise similarly situated defendants: "The individual was not doing it in the malicious manner that you want to punish, to the same degree as somebody who gets that information and immediately turns to monetizing it in some way." 1-ER-59. Each consideration

represents a permissible divergence from the way the government asks the Court to understand the nature and seriousness of the offense. *See* Opening Br. at 44–47.

Contrary to the government's suggestion, *id.* at 45, Judge Lasnik did *not* imply that Ms. Thompson had acted with exclusively pure motives. The defense sentencing memorandum had conceded a similar point:

> Ms. Thompson never presented herself as a full-fledged "white hat hacker" or "security researcher," but argued instead that the government's interpretation of the CFAA here (a) did not provide white hat hackers/security researchers and individuals like Ms. Thompson with notice that their actions may be criminal; and (b had the potential to chill white hat hackers/security researchers from providing the exceptionally important cybersecurity service that they do in this day and age.

2-ER-39. What Judge Lasnik conveyed was that Ms. Thompson's *degree* of malice was tempered by her failure to monetize the data and by her "tortured and tormented" disclosure to a security researcher on Twitter (rather than through the formal responsible disclosure bounty programs that the victim companies would have preferred). 1-ER-59. There is no abuse of discretion in assessing different degrees of malice rather than treating the issue of malice as a "yes" or "no" question.

Judge Lasnik also explicitly discussed specific and general deterrence and the need to protect the public. As for general deterrence, he made it clear that he had heard the government's argument on that score:

> Mr. Friedman is absolutely right, there are some people out there who are looking at the cost-benefit analysis and saying: Man, if I can get away with credit for time served of 100 days [the defense recommendation], with the possibility of making a couple million dollars with this, I'm going to take the chance. It's not like a crime of passion that happens, when people are not considering those things. So it's an absolutely appropriate argument for the government to make.

1-ER-58–59. Although Judge Lasnik was not explicit about the impact of this argument, it is noteworthy that he rejected that defense recommendation of a time-served sentence for a more onerous extended probation term with three years of home confinement. The utility of general deterrence is somewhat limited when the offense conduct requires sophisticated technical knowledge beyond the ken of the average criminally inclined individual, but Ms. Thompson's enormous restitution obligation of nearly $41 million should deter anyone in it for "a couple million dollars." 1-SER-2. On specific deterrence, Judge Lasnik had clearly thought deeply about this factor and—given his long career watching defendants and their recidivism patterns—stated he was

> confident to put my reputation on the line and say, I do not believe Paige Thompson will reoffend. And if that does happen, she'll be in violation of her probation, and I'll deal with it, and I'll admit my mistake. But I believe in her, and I believe that she will prove this was the right sentence, going forward.

1-ER-65. He also imposed multiple special conditions of supervised release that strictly monitored Ms. Thompson's computer use. *See* 1-ER-61–63. All deterrence calculations are predictions, and the government is on shaky ground asking this

Court to substitute its own prediction for a seasoned jurist who presided over the case for three years, sat through an eight-day trial, and oversaw multiple pretrial proceedings.

**B.** **A sentencing judge's attention to a defendant's history and characteristics, including personal vulnerability to harm in prison, is required by statute and has been explicitly approved by the Supreme Court.**

As is evident above, Judge Lasnik did not base his sentencing decision solely on Ms. Thompson's transgender status. But 18 U.S.C. § 3553(a) requires the consideration of the "history and characteristics of the defendant" as central factors in fashioning an appropriate sentence. Here, those factors included Ms. Thompson's lack of criminal history and extensive history of childhood abandonment and trauma, sexual exploitation, mental health challenges including current diagnoses of ADHD, major depressive disorder, autism spectrum disorder, and five or six emotional or psychiatric hospitalizations. *See generally* PSR. They also include her status as a 5'11", 130-pound transgender woman. PSR-15, ¶ 90.

Both parties and Probation urged Judge Lasnik to pay attention to Ms. Thompson's transgender status. *See* 1-ER-41–42 (government explaining current BOP transgender policy and agreeing "that is an important issue…. We acknowledge that that's an issue. It's something we've considered in making our recommendation, but it's something that I think is consistent with our recommendation"); 1-ER-46 (defense argument that a custodial sentence would

"deprive her of the opportunity to receive effective treatment, effective treatment in the community, based on the conditions outlined by both our experts" including an expert psychologist specializing in transgender issues); 1-ER-48 (defense argument that prison would be an "unsafe, unsupportive environment, surrounded by individuals keen on objectifying and marginalizing her"); PSR-21, ¶ 143 (factors that may warrant a sentence outside the guideline range include "Ms. Thompson's gender identity and the extraordinary difficulty that she may experience serving a custodial sentence, her compliance and stability on pretrial supervision, and her unstable and difficult childhood").

Faced with the parties and Probation arguing about how Ms. Thompson's gender identity may affect an adequate sentence, Judge Lasnik would have abused his discretion had he refused to consider this factor. Indeed, the Supreme Court has held that factors that affect a defendant's vulnerability to violence in prison are appropriate considerations in sentencing. *See Koon v. United States*, 518 U.S. 81, 111–12 (1996) (endorsing the consideration of a finding that police officers who participated in the beating of Rodney King were "particularly likely to be targets of abuse during their incarceration"). As the Supreme Court observed while considering a *Bivens* claim arising out of a transsexual woman prisoner being transferred to a federal penitentiary where she was severely beaten and raped, "being violently assaulted in prison is simply not part of the penalty that criminal

offenders pay for their offenses against society." *Farmer v. Brennan* 511 U.S. 825, 834 (1994).

Other circuits have endorsed the consideration of sexual or gender minority status specifically regarding vulnerability to violence in prison. In *United States v. Lara*, for example, the Second Circuit found appropriate the district court's consideration of the bisexual defendant's likelihood of being victimized in prison. 905 F.2d 599, 603 (2d Cir. 1990). The Seventh Circuit recently stated in a procedural reasonableness challenge that "Price's mitigation argument that she would be subject to great harm [as a transgender woman] in prison and therefore warranted a non-custodial sentence had legal merit." *United States v. Price*, 84 F.4th 738, 741 (7th Cir. 2023). And this Court has acknowledged that individual characteristics giving rise to a vulnerability in prison such as "stature, [ ] demeanor, [and] naivete" are permissible considerations. *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002).

Judge Lasnik did not abuse his discretion in considering this factor or even in giving it significant weight, especially since he had participated in a very detailed detention appeal focused primarily on how this factor and other personal characteristics of Ms. Thompson rendered her uniquely vulnerable to harm in custody.

**C.     Ms. Thompson's case, which involved no violence, is strikingly unlike the two terrorism cases cited by the government.**

This Circuit has vacated sentences for substantive unreasonableness on very rare occasions. That stems in part from the fact that the standard is "highly contextual and do[es] not permit easy repetition in successive cases." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). Here, the government cites to only two cases in which a government appeal of a sentencing decision succeeded: *United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) (en banc), and *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021). Both are terrorism cases involving very unusual facts, and the issues they present are not relevant here.

*Ressam* was a "horrific" terrorism case involving a "plot to blow up LAX [that] would have resulted in many deaths and injuries, substantial property damage, and enormous disruption to the nation's transportation system." 679 F.3d at 1090. The defendant's "clear intent was to intimidate this nation and the world, and he sought to influence world events and the conduct of the United States government through that intimidation." *Id.* In *Ressam,* this Court held that the sentencing court had not taken adequate account of the defendant's decision to cease cooperating between the two sentencing decisions. It was easy to observe that this development had not affected the district court's sentencing decision because the sentence *did not change* between the first sentencing (before the

42

defendant had ceased cooperating) and the second (after he had). *Id.* at 1082. There is simply no comparison with Ms. Thompson's case, which involved no violence and in which the court's sentencing discussion showed that he thought about the nature and circumstances of the offense in some detail, rather than demonstrably ignoring an important consideration.

In *Ceasar*, 10 F.4th at 68, the defendant was an avowed ISIS supporter who had facilitated communications between ISIS members to aid the travel of U.S.-based ISIS supporters to ISIS-controlled territory. She was committed to a terrorist ideology and, when released from pretrial detention, she promptly resumed trying to contact ISIS members and helped them to delete incriminating communications. *Id.* Her conduct may have stemmed from a search for community occasioned by her extensive history of sexual abuse, but her pretrial conduct made it clear it would be difficult to specifically deter her from the exact same offense conduct. *Id.* at 69. Because of the evident danger posed by this dedication to violent ideology, the district court's large downward variance to 48 months' incarceration failed to adequately account for "the goals of protecting the public, deterring criminal behavior, and engendering respect for the law" and introduced unwarranted sentencing disparities. *Id.* at 70. Notably, the government in *Ceasar* had advocated for a 360 to 600 months' Guidelines sentence, as compared to the government's recommendation of a large downward variance here.

Ms. Thompson's case did not involve terrorism or even violence. She had demonstrated substantial improvement in her mental health situation on pretrial release, and there was no motivating ideology presenting stark challenges for specific deterrence. *See United States v. Mumuni*, 946 F.3d 97, 112–13 (2d Cir. 2019) (internal quotation marks and alteration omitted) (quoted by *Ceasar*, 10 F.4th at 79) ("Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal."). Terrorism cases are irrelevant to the substantive unreasonableness analysis here.[9]

This is not the "exceptional case[ ] where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted); *see also Rigas*, 583 F.3d at 123 (explaining that the substantive unreasonableness standard in appellate review provides relief "only in the proverbial 'rare case.'"). Applying the general principles of "substantive reasonableness" in the circumstances presented supports the conclusion that the sentence imposed on Ms. Thompson was substantively reasonable as a matter of law.

---

[9] As Judge Reinhardt noted in a concurrence, "No case could be more atypical and less suited for the development of general substantive unreasonableness rules than the case of a foreign enemy terrorist who enters the United States to wage war on this nation." *Ressam*, 679 F.3d at 1098 (Reinhardt, J., concurring).

## CONCLUSION

The Court should affirm Ms. Thompson's sentence of 100 days'
incarceration, five years of probation including three years of home confinement,
almost $41 million in restitution, and extensive general and computer-related
conditions of supervised release because it is substantively reasonable.

Dated this 13th day of November 2023.

s/ *Vicki Lai*
Chief Appellate Attorney

s/ *Ann K. Wagner*
Assistant Federal Public Defender

Attorneys for Paige A. Thompson

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party. This brief contains 10,275 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated this 13th day of November 2023.

s/ *Vicki Lai*
Chief Appellate Attorney
Attorney for Paige A. Thompson