No. 22-30179

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

PAIGE A. THOMPSON,

Defendant-Appellee.

On Appeal from United States District Court
Western District of Washington at Seattle
District Court Case No. 2:19-cr-00159-RSL

The Honorable Robert S. Lasnik
United States District Judge

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 2**

Vicki Lai
Chief Appellate Attorney
Ann Wagner
Assistant Federal Public Defender
Attorneys for Paige A. Thompson
Federal Public Defender's Office
1601 5th Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

　　　　　Plaintiff,

　　　v.

PAIGE A. THOMPSON,

　　　　　Defendant.

Case No. CR19-159-RSL

ORDER OF RESTITUTION

This matter comes before the Court following a hearing that took place on December 1, 2022, regarding the restitution obligations of defendant Paige Thompson. Having considered the arguments presented at the hearing, as well as the government's memoranda (Dkts. # 395 & 398), defendant's response (Dkt. # 396), and the balance of the record, the Court orders that defendant pay restitution in the amount of $40,745,000.

Defendant was convicted at trial of wire fraud, in violation of 18 U.S.C. § 1343, and six counts of computer fraud and abuse, in violation of 18 U.S.C. § 1030. Dkt. # 385. On October 4, 2022, this Court sentenced Thompson to time served and five years' probation, setting over the issues of restitution and forfeiture. Dkt. # 390.

Under the Mandatory Victims Restitution Act of 1996 (MVRA), courts are required to order defendants convicted of covered crimes to pay restitution to the victims of those crimes. 18 U.S.C. § 3663A(a)(1). The act applies to "offense[s] against property under [Title 18] . . . including any offense committed by fraud or deceit" in which "an identifiable victim or victims has suffered a . . . pecuniary loss." Id. § 3663A(c)(1)(A)(ii), (B). Restitution should be awarded

ORDER OF RESTITUTION - 1

1  "'for actual losses caused by the defendant's criminal conduct.'" United States v. Peterson, 538

2  F.3d 1064, 1075 (9th Cir. 2008) (quoting United States v. Gamma Tech Indus. Inc., 265 F.3d

3  917, 927 (9th Cir. 2001). "The government has the burden of establishing by a preponderance of

4  the evidence that the victim's damages were caused by the conduct of which the defendant was

5  convicted." Id. at 1075-76 (quoting United States v. Rice, 38 F.3d 1536, 1540 (9th Cir. 1994)).

6  The MVRA requires that the Court impose restitution "without consideration of the economic

7  circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

8      In this case, the only victim requesting restitution is Capital One. See Dkt. # 395 at 4.

9  Capitol One requests restitution for the following costs: (a) $120,000 to hire a cyberforensics

10  firm; (b) $2,700,000 to store relevant log data and remediate breached buckets of data; (c)

11  $425,000 to hire a third party to confirm the number of impacted individuals; (d) $2,500,000 to

12  notify impacted individuals; (e) $5,000,000 to establish a call center to assist impacted

13  individuals; and (f) $30,000,000 to pay for credit monitoring for impacted individuals. Id. The

14  Court finds these costs were actual losses caused by the defendant's criminal conduct.

15  Defendant is ordered to pay restitution to Capitol One in the amount of $40,745,000. Interest on

16  the restitution is waived.

17      IT IS SO ORDERED.

18

19      DATED this 6th day of December, 2022.

20

21

22      *MΛS Lasnik*

23      Robert S. Lasnik
        United States District Judge

24

25

26

27

28

ORDER OF RESTITUTION - 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       ) CASE NO. CR19-00159-RSL
                               )
v.                             ) Seattle, Washington
                               )
PAIGE A. THOMPSON,             ) June 8, 2022
                               ) 9:12 a.m.
              Defendant.       )
                               ) JURY TRIAL, Vol. 2 of 9
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


  For the Plaintiff:      ANDREW C. FRIEDMAN
                          JESSICA M. MANCA
                          TANIA M. CULBERTSON
                          United States Attorney's Office
                          700 Stewart Street, Suite 5220
                          Seattle, WA 98101


  For the Defendant:      MOHAMMAD ALI HAMOUDI
                          NANCY TENNEY
                          Federal Public Defender's Office
                          1601 5th Avenue, Suite 700
                          Seattle, WA 90071

                          BRIAN E. KLEIN
                          MELISSA A. MEISTER
                          Waymaker LLP
                          515 S Flower Street, Suite 3500
                          Los Angeles, CA 90071


  Reported by:            Nancy Bauer and Marci Chatelain
                          Official Federal Court Reporters
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101

2

INDEX

EXAMINATION OF                                          PAGE

STEVE SCHUSTER          DIRECT EXAMINATION          62
                        BY MR. FRIEDMAN

                        CROSS-EXAMINATION          118
                        BY MR. KLEIN

                        REDIRECT EXAMINATION       137
                        BY MR. FRIEDMAN

KRISTEN VALENTINE       DIRECT EXAMINATION         143
                        BY MS. MANCA

                        CROSS-EXAMINATION          168
                        BY MR. HAMOUDI

                        REDIRECT EXAMINATION       178
                        BY MS. MANCA

                        RECROSS-EXAMINATION        178
                        BY MR. HAMOUDI

MICHAEL FISK            DIRECT EXAMINATION         179
                        BY MR. FRIEDMAN




GOVERNMENT'S OPENING STATEMENT BY MS. MANCA        20
DEFENSE'S OPENING STATEMENT BY MR. KLEIN           46

1    A.    I was there just under 11 years.

2    Q.    And when did you leave?

3    A.    November of 2013.

4    Q.    Did you switch to another job after you left Cornell?

5    A.    I did.  I joined Amazon Web Services.

6    Q.    What job did you take at Amazon Web Services?

7    A.    I took the director of security incident response --

8    security incident and response and engineering.

9    Q.    Okay.  Now, Amazon Web Services is part of another company;

10   is that correct?

11   A.    It's part of Amazon, correct.

12   Q.    And what part of Amazon -- when we think of Amazon, what do

13   most people think of?

14   A.    They think of the retail side of the business, ordering

15   books and other products.

16   Q.    Is that what Amazon Web Services does?

17   A.    We do not.

18   Q.    What does Amazon Web Services do?

19   A.    Amazon offers a set of services and infrastructure called

20   "the cloud" that companies can use to host their services or

21   products.

22   Q.    Okay.  Computer services, basically?

23   A.    Typically, yes.

24   Q.    Okay.  And you said -- I think you said you were the

25   incident response leader; is that correct?

1          THE WITNESS:  Okay.

2          THE COURT:  And then we'll let you go, okay?

3          THE WITNESS:  All right.  Thank you.

4          THE COURT:  Thanks for coming up.

5       I think it's safe to go out now.

6              (Court in recess 3:03 p.m. to 3:24 p.m.)

7            THE FOLLOWING PROCEEDINGS WERE HELD
              IN THE PRESENCE OF THE JURY:
8

9          THE COURT:  Okay.  Your cross-examination of

10   Ms. Valentine, Mr. Hamoudi?

11                      CROSS-EXAMINATION

12   BY MR. HAMOUDI:

13   Q.   Good afternoon, Ms. Valentine.  You thought this was a cry

14   for help, didn't you?

15   A.   I did later, yes.

16   Q.   Your Twitter profile, it had a link to your LinkedIn

17   profile?

18   A.   No, but I have a pretty unique name, so it's easy to search

19   on LinkedIn.

20   Q.   So your LinkedIn profile, I want to talk to you about your

21   professional background.

22   A.   Sure, yeah.

23   Q.   Okay.  All right.  And just for references, this profile is

24   used for professional networking and career development?

25   A.   Yes.

1

```
                   UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON AT SEATTLE
    _____

    UNITED STATES OF AMERICA,        )
                                     )
                     Plaintiff,      )  CASE NO. CR19-00159-RSL
                                     )
    v.                               )  Seattle, Washington
                                     )
    PAIGE A. THOMPSON,               )  June 9, 2022
                                     )  9:00 a.m.
                     Defendant.      )
                                     )  JURY TRIAL, Vol. 3 of 9
    _____

                 VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE ROBERT S. LASNIK
                UNITED STATES DISTRICT JUDGE
    _____

    APPEARANCES:


      For the Plaintiff:        ANDREW C. FRIEDMAN
                                JESSICA M. MANCA
                                TANIA M. CULBERTSON
                                United States Attorney's Office
                                700 Stewart Street, Suite 5220
                                Seattle, WA 98101


      For the Defendant:        MOHAMMAD ALI HAMOUDI
                                NANCY TENNEY
                                Federal Public Defender's Office
                                1601 5th Avenue, Suite 700
                                Seattle, WA 98101

                                BRIAN E. KLEIN
                                MELISSA A. MEISTER
                                Waymaker LLP
                                515 S Flower Street, Suite 3500
                                Los Angeles, CA 90071


      Reported by:              Nancy Bauer and Marci Chatelain
                                Official Federal Court Reporters
                                700 Stewart Street, Suite 17205
                                Seattle, WA 98101
```

INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| MICHAEL FISK | DIRECT EXAMINATION cont.<br>BY MR. FRIEDMAN | 6 |
| | CROSS-EXAMINATION<br>BY MR. HAMOUDI | 71 |
| | REDIRECT EXAMINATION<br>BY MR. FRIEDMAN | 98 |
| | RECROSS-EXAMINATION<br>BY MR. HAMOUDI | 103 |
| | REDIRECT EXAMINATION<br>BY MR. FRIEDMAN | 105 |
| ZACHAREY HANSEN | DIRECT EXAMINATION<br>BY MS. MANCA | 108 |
| | CROSS-EXAMINATION<br>BY MR. KLEIN | 120 |
| | REDIRECT EXAMINATION<br>BY MS. MANCA | 127 |
| JOEL MARTINI | DIRECT EXAMINATION<br>BY MR. FRIEDMAN | 129 |
| | CROSS-EXAMINATION<br>BY MR. HAMOUDI | 178 |
| JOSEPH ADAM BALEDA | DIRECT EXAMINATION<br>BY MS. CULBERTSON | 198 |
| | CROSS-EXAMINATION<br>BY MR. KLEIN | 204 |

1    Q.    And what does the last line, the next Tweet say?

2    A.    Well, it says, "Their SSNs with full name and DOB," which I

3    interpret to mean there are Social Security numbers with full

4    names and date of births.

5    Q.    Was Capital One concerned when it received this attachment?

6    A.    Yes, very.

7    Q.    And why is that?

8    A.    Well, it indicates that there could be an exposure of our

9    customers' private data to the public.

10   Q.    As part of your investigation, was Capital One able to

11   confirm whether data had, in fact, been taken out of Capital

12   One?

13   A.    Yes.

14   Q.    And what was the answer?

15   A.    It was taken, yes.

16   Q.    By when did Capital One confirm that?

17   A.    On the 18th, I believe, we confirmed -- or the 19th, I

18   think, we confirmed that data was successfully taken, and then

19   on the 20th, we had identified that there were things like

20   customer privacy information in the data.

21   Q.    What did Capital One do once it had confirmed that?

22   A.    Well, several things, but one was to notify law

23   enforcement.

24   Q.    Do you recall, generally, what law enforcement you

25   notified?

Case: 22-30107, 09/15/2022, ID: 12531482, DktEntry: 6-2, Page 15 of 207
Case 2:19-cr-00159-RSL Document 334 Filed 06/24/22 Page 151 of 207

15
Michael Fisk - Direct continued by Mr. Friedman

1  A.    The FBI, I believe.

2  Q.    Okay.  By the time that Capital One notified law

3  enforcement on the 20th, did you believe you had identified the

4  person responsible for this?

5  A.    Yes; since the initial tip provided some strong

6  indications, yes.

7  Q.    Let's go to Exhibit 201, and tell me what you're calling an

8  "indication."

9  A.    So the URL, the link there to GitHub, the thing after

10 "GitHub.com" says "Paige Adele Thompson," and then, in GitHub,

11 posts are owned by a user, and that part of that URL is what has

12 the user name for the person who posted the information.

13 Q.    So did you believe it was someone named Paige Adele

14 Thompson?

15 A.    Certainly that was the hypothesis, given the name, yes.

16 Q.    Okay.  Did you or people working with you go to linked

17 sites, sites that were linked or connected to this GitHub site?

18 A.    Yes.

19 Q.    Where did you go?

20 A.    One of them was a link to GitLab, which is a similar sort

21 of publishing site.

22 Q.    Okay.  And from GitLab, was there anywhere particular that

23 you went?

24 A.    Yeah.  On that site, we found a resumé for Paige Thompson.

25 Q.    Would you take a look at Exhibit 206 and tell me if you

Case: 22-30170, 03/20/2023, ID: 12345482, DktEntry: 6-2, Page 16 of 207
Case 2:19-cr-00159-RSL Document 344 Filed 06/24/22 Page 16 of 207
Michael Fisk - Direct continued by Mr. Friedman                    16

1  recognize that?

2  A.    Yes.

3  Q.    Is that the resumé?

4  A.    Yes.

5          MR. FRIEDMAN:  Your Honor, this has not been offered,

6  so government offers Exhibit 206.

7          MR. HAMOUDI:  I don't have an objection.

8          THE COURT:  206 is admitted and may be displayed.

9              (Government Exhibit 206 admitted.)

10 Q.    (By Mr. Friedman)  Whose resumé is that that you found?

11 A.    Paige Thompson's.

12 Q.    Does it list a variety of jobs?

13 A.    Yes.

14 Q.    What is the most recent job listed?

15 A.    It was with Amazon.

16 Q.    And a specific part of Amazon?

17 A.    It says, "Simple Storage Services," which is part of the

18 AWS cloud service.

19 Q.    Is that S3 when we talk about S3 and S3 buckets?

20 A.    Yes.

21 Q.    When had Ms. Thompson worked at Amazon or AWS?

22 A.    In 2015 and 2016.

23 Q.    And so when you were looking at this, how long since her

24 employment terminated?

25 A.    Well, it was 2019, so it was two and a half, going on three

Case: 22-30110, 09/15/2022, ID: 12541482, DktEntry: 11-2, Page 173 of 207
Michael Fisk - Direct continued by Mr. Friedman

17

1 years.

2 Q.    And then above that, do you see the top section that talks,

3 I guess, about skills or proficiencies?

4 A.    Yes.

5 Q.    Let's look at the section related to AWS.  What are the

6 first three proficiencies listed there?

7 A.    S3, the Simple Storage Service; EC2, which is the elastic

8 computer virtual server service; and IAM, which is Identity and

9 Access Management service.

10 Q.    Okay.  Mr. Fisk, do you have an understanding, from your

11 work with the breach, of how this breach took place?

12 A.    Yes.

13 Q.    And in general terms, did it relate to misconfigurations or

14 configurations of different things at Capital One?

15 A.    Yes.

16 Q.    Were there two principal ones?

17 A.    Yes.

18 Q.    Would looking at Exhibit 111 -- this has not been offered

19 so it will just be on your screen -- would that help explain

20 your understanding?

21 A.    Yes.

22           MR. FRIEDMAN:  Government offers Exhibit 111.

23           THE COURT:  Any objection?

24           MR. HAMOUDI:  No, Your Honor.

25           THE COURT:  It is admitted and can be published.

```
                      UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON AT SEATTLE.
        _____

                                    )
        UNITED STATES OF AMERICA,    )
                                    ) CASE NO. CR19-00159-RSL
                     Plaintiff,      )
                                    ) Seattle, Washington
        v.                          )
                                    ) June 10, 2022
        PAIGE A. THOMPSON,          ) 9:02 a.m.
                                    )
                     Defendant.      ) JURY TRIAL, Vol. 4 of 9
                                    )
        _____

                      VERBATIM REPORT OF PROCEEDINGS
                  BEFORE THE HONORABLE ROBERT S. LASNIK
                     UNITED STATES DISTRICT JUDGE
        _____

        APPEARANCES:

          For the Plaintiff:      ANDREW C. FRIEDMAN
                                  JESSICA M. MANCA
                                  TANIA M. CULBERTSON
                                  United States Attorney's Office
                                  700 Stewart Street, Suite 5220
                                  Seattle, WA 98101

          For the Defendant:      MOHAMMAD ALI HAMOUDI
                                  NANCY TENNEY
                                  Federal Public Defender's Office
                                  1601 5th Avenue, Suite 700
                                  Seattle, WA 90071

                                  BRIAN E. KLEIN
                                  MELISSA A. MEISTER
                                  Waymaker LLP
                                  515 S Flower Street, Suite 3500
                                  Los Angeles, CA 90071


          Reported by:           Nancy Bauer and Marci Chatelain
                                  Official Federal Court Reporters
                                  700 Stewart Street, Suite 17205
                                  Seattle, WA 98101
```

2

INDEX

EXAMINATION OF                                                PAGE

MATTHEW PELAGGI          DIRECT EXAMINATION      5
                        BY MR. FRIEDMAN

                        CROSS-EXAMINATION       16
                        BY MR. HAMOUDI

CHRISTOPHER CHAN         DIRECT EXAMINATION      23
                        BY MS. CULBERTSON

                        CROSS-EXAMINATION       36
                        BY MR. KLEIN

VINCENT KENNEY           DIRECT EXAMINATION      40
                        BY MR. FRIEDMAN

                        CROSS-EXAMINATION       75
                        BY MR. KLEIN

                        REDIRECT EXAMINATION    88
                        BY MR. FRIEDMAN

                        RECROSS-EXAMINATION     90
                        BY MR. KLEIN

WAYMON HO                DIRECT EXAMINATION      91
                        BY MS. MANCA

1   currency.

2   Q.    Okay.  And does this refer to the issue of converting to

3   currency that you were talking about a moment ago?

4   A.    Yes.

5   Q.    What is the reference to gift cards?  Do you understand

6   what that would be in this context?

7   A.    Yeah.  So I guess if someone wanted to buy gift cards with

8   cryptocurrency, that could be one way to convert the

9   cryptocurrency to a form of payment that they can use.

10  Q.    Would you take a look at Exhibit 801?

11        This has not yet been admitted.

12        Do you recognize this?

13  A.    Yes, I do.

14  Q.    What's your understanding of what this is?  Not the details

15  of it, where it came from.

16  A.    Yeah.  So this was a script that Waymon received from the

17  subject's computer.

18  Q.    When you say "Waymon," to whom are you referring to?

19  A.    Waymon Ho, computer scientist out of the Seattle field

20  office.

21        MR. FRIEDMAN:  Your Honor, the government intends to

22  offer this through Mr. Ho, and so we do it provisionally now,

23  unless there's no objection.

24        MR. KLEIN:  We don't object, Your Honor.

25        THE COURT:  Okay.  801 can be admitted now subject to

1   Mr. Ho seeing it.

2                    (Government Exhibit 801 admitted.)

3            THE COURT:  And you can display it.

4            MR. FRIEDMAN:  Thank you, Your Honor.

5   Q.   (By Mr. Friedman)  Okay.  You said your understanding is

6   this was something that was on Ms. Thompson's computer?

7   A.   Correct.

8   Q.   Okay.  What, in general -- let's start at the very bottom

9   of this.  What is the bottom two or three lines -- two lines?

10  A.   Yeah.  So the very bottom line that starts /ethminer, that

11  is a program that was run to join the Nanopool mining pool and

12  participate as a miner.

13  Q.   Okay.  And although this script was found on the

14  computer --

15  A.   Uh-huh.

16  Q.   -- you don't know what computer that program was run on or

17  where that software was installed, do you?

18  A.   Correct.

19  Q.   Okay.  But this would be an instruction for some computer

20  to join Nanopool?

21  A.   Correct.

22  Q.   And then at the top, do you see additional information

23  relevant to joining Nanopool?

24  A.   Yeah.  So at the very top, a few lines down where it says

25  "export ETH_ACCT," that is the address that will receive funds

 1  from participating in the mining pool.

 2  Q.    ETH_ACCT, what does that mean?

 3  A.    That would be Ethereum account.

 4  Q.    Okay.  So this is for mining Ethereum?

 5  A.    Correct.

 6  Q.    And then are all those digits after that the address?

 7  A.    That is the address.

 8  Q.    Okay.  Because it's hard to remember those, I'm going to

 9  refer to them just by the first six digits, perhaps the --

10  A.    Sure.

11  Q.    -- 0x5a86?

12  A.    Correct.

13  Q.    Okay.  Is that the only address that you're aware of in

14  this case that starts with those six figures?

15  A.    Yes.

16  Q.    Did you do some analysis relating to that wallet?

17  A.    I did.

18  Q.    Okay.  And tell us in general terms, how did you start

19  doing that analysis?

20  A.    Yeah.  So I started by going to an online block explorer

21  and entering that address, that account, into the online block

22  explorer.

23  Q.    What is a block explorer?

24  A.    So a block explorer is an easy way to view these records

25  that are kept on the blockchain.

1  Q.  Okay.  And you said you went to one called Etherscan?

2  A.  Correct.

3  Q.  Is that a well-known block explorer?

4  A.  That is a well-known one.

5  Q.  In your experience, has the information that you found on

6  there generally been accurate and reliable?

7  A.  Yes.

8  Q.  How do you know that or what did you check that against?

9  A.  So I can verify that by downloading the full Ethereum

10 blockchain and confirming that information with a local copy of

11 Ethereum blockchain.

12 Q.  And as we walk through your analysis, is that something you

13 ultimately did in this case?

14 A.  It is.

15 Q.  Let's first talk about what you found with the block

16 explorer.

17     Would you look at Exhibit 851 and tell me if you recognize

18 that?

19 A.  Yes, I do.

20 Q.  What is that?

21 A.  That is the main page for the address that we saw in the

22 prior document.

23          MR. FRIEDMAN:  The government offers Exhibit 851.

24          MR. KLEIN:  No objection, Your Honor.

25          THE COURT:  851 is admitted.

1          (Government Exhibit 851 admitted.)

2     Q.   (By Mr. Friedman)  So, in general terms, what does this

3     page show?

4     A.   This page shows different transactions that were made to

5     that particular address.

6     Q.   Okay.  Is it a -- it's a list of transactions?

7     A.   It is a list.

8     Q.   And is it all of the transactions to the wallet or are we

9     just looking at one page?

10    A.   We're just looking at a partial amount of the transactions.

11         MR. FRIEDMAN:  Okay.  And Special Agent Martini is

12    just blowing that up.

13    Q.   (By Mr. Friedman)  For what period were you looking at

14    transactions?

15    A.   Yes.  I was looking from March 10th to August 15th -- I'm

16    sorry, August 5th, 2019.

17    Q.   Okay.  But were you looking more broadly, even if that's

18    what you found?

19    A.   I looked at the total sum of transactions.

20    Q.   Let me stop you.

21         Were you looking more broadly in 2019 to see if there were

22    other transactions, but that -- these are the ones that you

23    found?

24    A.   Correct.

25    Q.   Did you look for the entire year of 2019?

1    A.    I did.

2    Q.    Okay.  And were you looking for just incoming or incoming

3    and outgoing?

4    A.    I was primarily looking for incoming, received

5    transactions.

6    Q.    Okay.  So these are incoming transactions during that

7    period?

8    A.    Correct.

9    Q.    Okay.  And now, can you tell me, what was -- what

10   transactions did you find?  What was the beginning and the end,

11   first and last?

12   A.    Sure.  So in this list, you can see that a number of these

13   transactions or all of these, really, were coming from a

14   recipient called Nanopool to a particular address of interest.

15   Q.    Right, but what was the time period?  What was the first

16   transaction that you found?

17   A.    Ah, it was March 10th.

18   Q.    And what was the last incoming transaction that you found?

19   A.    August 5th.

20   Q.    And in total, how many incoming transactions did you find

21   for 2019?

22   A.    261.

23   Q.    Okay.  And is it fair to say that each line on the screen

24   that we're looking at now is one transaction?

25   A.    That's correct.

1  Q.  So what information were you able to pull about each of

2  those transactions?

3  A.  Yeah.  So I was able to pull the transaction hash, which is

4  the unique value associated with it, the block number, so what

5  block it was appended to in the blockchain, and then the from

6  and the to recipient of that transaction, and then also the

7  amount that was received.

8  Q.  And the date and time in the central column?

9  A.  And the date and time, yes.

10  Q.  Okay.  Of the 261 transactions that you found, from whom

11  did those come?

12  A.  Those came from a recipient named Nanopool.

13  Q.  Okay.  So all of them were Nanopool?

14  A.  Correct.

15  Q.  And this probably is going to be not surprising, you were

16  searching for one wallet; correct?

17  A.  That's correct.

18  Q.  Was the recipient of all the 261 then the owner of that

19  wallet?

20  A.  Correct.

21  Q.  And where do you see that here?

22  A.  So I can see that here under the "to" address.

23  Q.  Okay.  Each of those starts with a 0x5a86?

24  A.  Correct.

25  Q.  Okay.  Once you had done this and identified the 261

1  transactions, what did you do next?

2  A.   I then looked at an individual transaction hash for this

3  particular transaction or for all transactions.

4  Q.   Okay.  Is exhibit -- take a look at Exhibit 852 and tell me

5  if that reflects that.

6  A.   Yes.  This is the transaction details from a specific

7  transaction hash.

8          MR. FRIEDMAN:  Government offers Exhibit 852.

9          MR. KLEIN:  No objection, Your Honor.

10          THE COURT:  852 is admitted.

11              (Government Exhibit 852 admitted.)

12  Q.   (By Mr. Friedman)  Okay.  And so the first line here is

13  transaction hash?

14  A.   Correct.

15  Q.   Is that the code number or identifier for this particular

16  transaction?

17  A.   That's the unique identify for this particular transaction.

18  Q.   And what information were you able to derive about this

19  transaction?

20  A.   Yeah.  I could derive that it comes from block 7460822, and

21  that it was made on March 29th, 2019.  And in particular, in

22  this display, I can see the address that's associated with

23  Nanopool, the "from" address and then the "to" address, which is

24  the address we saw in that script previously, 0x5a86.

25  Q.   Okay.  And do you see the value of this particular

1   transaction?

2   A.   I also do see the value.

3   Q.   About a fifth of an Ether?

4   A.   Correct.

5   Q.   Okay.  At this point, was this the end of your analysis

6   using the block scanner, and did you switch to looking at

7   something else?

8   A.   Yes.  So this is where I concluded using Etherscan.  And

9   then from here, I moved to confirm this information with a local

10  archive node of the Ethereum network that I've downloaded and

11  set up in an offline environment -- or in a stand-alone

12  environment, rather.

13  Q.   You downloaded the entire Ethereum blockchain?

14  A.   Correct.

15  Q.   And that's what you're referring to as a node?

16  A.   Correct.

17  Q.   Okay.  Did you look at the node for each of the 261

18  transactions?

19  A.   I did.  So by standing up a local node, I was able to

20  programatically make these requests for all 261 transactions.

21  Q.   Okay.  Does Exhibit 853 show part of that process?

22  A.   Yes.  This is the local explorer that I have setting up on

23  the machine that shows the individual block, that 7460822 block,

24  in the local archive node that I have.

25          MR. FRIEDMAN:  Okay.  Government offers Exhibit 853.

1          MR. KLEIN:  No objection, Your Honor.

2          THE COURT:  853?

3          MR. FRIEDMAN:  Yes, Your Honor.

4          THE COURT:  Is admitted.

5               (Government Exhibit 853 admitted.)

6   Q.   (By Mr. Friedman) So, Mr. Kenney, this is a record

7   relating to one block; right?

8   A.   Correct.

9   Q.   But it's a block that had a transaction in which you were

10  interested?

11  A.   Correct.

12  Q.   And so did you do this 261 times, I guess, unless some

13  blocks overlapped?

14  A.   Correct.

15  Q.   Okay.  What information did you get by doing this about

16  this particular transaction?

17  A.   So what I can tell is that the block has a block number, it

18  has some other information pertaining to the cryptocurrency

19  mining, but, in particular, it has the miner that mined and

20  appended this block to the blockchain, identified as 0x52bc.

21  And in particular, when the miner appends this block to the

22  blockchain, they will append their organization and their name.

23  And so what I can see in the data translated that this was

24  appended by Nanopool.org.

25  Q.   The fact that Nanopool is appending it means Nanopool won

1   this competition; right?

2   A.    That's correct.

3   Q.    And Nanopool received a reward?

4   A.    That's correct.

5   Q.    And that's why Nanopool is paying its members?

6   A.    Correct.  The reward was sent to that 0x52bc miner address.

7   Q.    Okay.

8          THE COURT:  I see the phrase gas limit and gas price,

9   what does that refer to?

10         THE WITNESS:  These refer to transaction fees that are

11  involved in powering the network.

12         THE COURT:  Why do they call them gas?

13         THE WITNESS:  Because Ethereum allows you to do

14  multiple different computing functions, and so they refer to

15  that as gas or power to be able to do these multiple computing

16  functions.

17         THE COURT:  Okay.  Thank you.

18         THE WITNESS:  Sure.

19  Q.    (By Mr. Friedman)  Mr. Kenney, after you had done this 261

20  times, or perhaps a couple less, I'm not sure, did you prepare a

21  spreadsheet that summarized -- that took all of the data you had

22  received and put it into one spreadsheet?

23  A.    Yes.

24  Q.    Would you look at Exhibit 855, which should be a

25  spreadsheet in native format.

```
1                        (Off the record.)

2              MR. FRIEDMAN:  Your Honor, I neglected to offer 854,

3    so I'd offer that.

4              THE COURT:  That's the one we just saw.

5              MR. FRIEDMAN:  We just saw it.  My co-counsel told me

6    I forgot to offer it and that maybe just we were seeing it?

7              THE COURT:  Did we admit 854, Victoria?

8              THE CLERK:  We haven't seen it.

9              MR. FRIEDMAN:  We haven't.  I'm sorry.

10        They're actually telling me I skipped a line and didn't

11   show 854.

12        Could we look at Exhibit 854 first?

13             THE COURT:  Sure.

14   Q.   (By Mr. Friedman)  Okay.  Do you see Exhibit 854?

15   A.   I do, yes.

16   Q.   Is this the next -- the next-to-last step in your analysis?

17   A.   This is.  So this is --

18             MR. FRIEDMAN:  Can I offer it first?

19        Government offers Exhibit 854.

20             MR. KLEIN:  One sec, Your Honor, I'm just going to

21   look at it real quick.

22             THE COURT:  Sure.

23             MR. KLEIN:  No objection.

24             THE COURT:  854 is admitted.

25                  (Government Exhibit 854 admitted.)
```

1  Q.   (By Mr. Friedman)  Tell us what this reflects.

2  A.   Okay.  So this is me entering in a single transaction that

3  I observed.  And from that transaction, I can see the unique

4  transaction value just under the big word Transaction.  And from

5  there, I can see two addresses listed under that transaction

6  value.  The same address that I saw in the previous slide,

7  0x52bc that we associated now with Nanopool, and that's being

8  sent to our address of interest from the script that we were

9  looking at at the beginning here, 0x5a86.  And the received

10 amount into that address was 0.2061 ETH.

11 Q.   Okay.  And so this is just looking inside the block on the

12 last slide and pulling the transaction out for more detail?

13 A.   Correct.  And this is the process that I used to pull out

14 all 261 transactions that were associated with that address.

15 Q.   That you put into your spreadsheet?

16 A.   That I put into the spreadsheet.

17 Q.   Great.

18      Let's look at Exhibit 855.

19      Is this the spreadsheet that you created?

20 A.   Yes.

21      MR. FRIEDMAN:  The government offers Exhibit 855.

22      MR. KLEIN:  Your Honor, we don't have a hard copy of

23 that.  I'm not saying I am going to object, but I would like to

24 look at -- since it's a whole spreadsheet, to somehow have a

25 chance to review it.

1    set of jury instructions today for you to look at over the

2    weekend, too, so...

3            MR. FRIEDMAN:  Thank you, Your Honor.

4            THE COURT:  Did you want to say anything, Mr. Klein?

5            MR. KLEIN:  No.

6            THE COURT:  Okay.  Great.

7        We're adjourned.

8                    (Court in recess 10:21 a.m. 10:42 a.m.)

9                THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:
10

11           THE COURT:  Mr. Klein, did you do what you wanted to

12   do?

13           MR. KLEIN:  Yes, Your Honor.  We're not going to be

14   objecting.

15           THE COURT:  No objection to the exhibit.  It's

16   admitted, whichever one it was.

17           MR. FRIEDMAN:  855.

18           THE COURT:  855.  Thank you.

19                (Government Exhibit 855 admitted.)

20           THE COURT:  You can continue, Mr. Friedman.

21           MR. FRIEDMAN:  I have to wait for it to get called up.

22   There we go.  Thank you.

23   Q.   (By Mr. Friedman)  So Exhibit 855 is the spreadsheet that

24   you prepared summarizing your results from the 261 searches?

25   A.   That's correct.

1   Q.   And we're looking at the top-left corner of that now?

2   A.   Correct.

3   Q.   In each line of this spreadsheet, does that have data that

4   reflects one of those 261 searches?

5   A.   That's correct.  These are different fields from that

6   specific transaction.

7   Q.   Okay.  And rather than ask the special agent to scroll

8   down, is it fair to say this is 261 lines long?

9   A.   Correct.

10  Q.   If we could go to Columns P, Q, and R.  What does that part

11  of the spreadsheet reflect?

12  A.   So P reflects the price of Ethereum, or Ether, one Ether,

13  at the time when this transaction was made.

14  Q.   Can I stop you for a moment?

15  A.   Yes.

16  Q.   Are these transactions roughly one per day --

17  A.   One single --

18  Q.   -- one line per day, roughly?

19  A.   Roughly, yes.

20  Q.   So an Ether was worth $142 on the first day?

21  A.   Correct.

22  Q.   $177 the next day?

23  A.   Yes.

24  Q.   Then it plummets to $138?

25  A.   That's correct.

1   Q.   Back to $240 the next day?

2   A.   Correct.

3   Q.   Why is it changing that much and that fast?

4   A.   Yeah.  So what gives these things value is their

5   tradability and the price people will accept for the traded

6   token.  So as a result, the price will fluctuate in the value of

7   these particular cryptocurrencies.

8   Q.   A lot and quickly?

9   A.   It can be, yes.

10  Q.   So that first column is the daily price for Ether?

11  A.   Correct.

12  Q.   What is the second column?

13  A.   That is the value that was received in this transaction.

14  Q.   So for first transaction, a fifth of an Ether?

15  A.   Correct.

16  Q.   And what is the third column?

17  A.   That is the amount of that value in U.S. dollars.

18  Q.   So you basically said a fifth of $142 was about 30 bucks?

19  A.   Correct.

20  Q.   And then did you total the amount of Ether received and the

21  dollar value?

22  A.   I did.

23  Q.   Is that at the bottom of the spreadsheet?

24  A.   It is.

25          MR. FRIEDMAN:  Can you scroll down, Agent?

1    Q.   (By Mr. Friedman)  And what totals did you come up with?

2    A.   The total amount in Ether is 55.2773841, and that is

3    $10,014.03.

4    Q.   All to this wallet?

5    A.   Correct.

6    Q.   Were there a couple other wallets you saw in the case?

7    A.   A value sent to those couple other wallets?

8    Q.   Not that you searched, but are you aware of other wallets

9    that were -- of which evidence was found on Ms. Thompson's

10   computer?

11   A.   There were other wallets, but, in particular, in this

12   spreadsheet, I was looking at this --

13   Q.   You analyzed so this is for this one wallet?

14   A.   Yes.

15           MR. FRIEDMAN:  Thank you very much, Mr. Kenney.

16           THE WITNESS:  For sure.

17           THE COURT:  Mr. Klein, questions for Mr. Kenney?

18           MR. KLEIN:  Yes, Your Honor.

19                     CROSS-EXAMINATION

20   BY MR. KLEIN:

21   Q.   Good morning.  I'm Brian Klein.  I represent Ms. Thompson.

22   A.   Good morning.

23   Q.   When did you start working on this case?

24   A.   I started working on this case roughly around March of

25   2022.

```
                    UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON AT SEATTLE
  _____

  UNITED STATES OF AMERICA,          )
                                     ) CASE NO. CR19-00159-RSL
                    Plaintiff,       )
                                     ) Seattle, Washington
  v.                                 )
                                     ) June 15, 2022
  PAIGE A. THOMPSON,                 ) 9:07 a.m.
                                     )
                    Defendant.       ) JURY TRIAL, Vol. 7 of 9
                                     )
  _____


                 VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE ROBERT S. LASNIK
                 UNITED STATES DISTRICT JUDGE
  _____

  APPEARANCES:


    For the Plaintiff:      ANDREW C. FRIEDMAN
                            JESSICA M. MANCA
                            TANIA M. CULBERTSON
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


    For the Defendant:      MOHAMMAD ALI HAMOUDI
                            NANCY TENNEY
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101

                            BRIAN E. KLEIN
                            MELISSA A. MEISTER
                            Waymaker LLP
                            515 S Flower Street, Suite 3500
                            Los Angeles, CA 90071


    Reported by:            Nancy L. Bauer, CRR, RPR
                            Marci Chatelain, CRR, RPR, RMP, CCR
                            Official Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov
```

INDEX

EXAMINATION OF                                                    PAGE

MATTHEW ORTIZ          DIRECT EXAMINATION          11
                       BY MR. KLEIN

                       CROSS-EXAMINATION           14
                       BY MS. MANCA

SETH EDGAR             DIRECT EXAMINATION          16
                       BY MR. KLEIN

                       CROSS-EXAMINATION           20
                       BY MS. CULBERTSON

TIM CARSTENS           DIRECT EXAMINATION          26
                       BY MR. HAMOUDI

                       CROSS-EXAMINATION           33
                       BY MS. MANCA

ALEX HALDERMAN         DIRECT EXAMINATION          34
                       BY MR. KLEIN

                       CROSS-EXAMINATION           76
                       BY MS. MANCA

                       REDIRECT EXAMINATION        95
                       BY MR. KLEIN

                       REDIRECT EXAMINATION        101
                       BY MR. KLEIN

                       RECROSS-EXAMINATION         103
                       BY MS. MANCA

WAYMON HO              DIRECT REBUTTAL             111
                       EXAMINATION
                       BY MS. MANCA

                       REBUTTAL                    114
                       CROSS-EXAMINATION
                       BY MR. KLEIN

                       REDIRECT REBUTTAL           115
                       EXAMINATION
                       BY MS. MANCA

1  say, the Linux operating system.  Really nerdy things.

2  Q.    Did Ms. Thompson seem capable?

3  A.    Absolutely.

4  Q.    What would you say about her potential?

5  A.    I would say that everyone in that group was on an extremely

6  promising path, and most of the people in that group have, in

7  fact, proven that right.  Among the people in that clique, I

8  would rank Paige as one of the more capable.

9  Q.    Did you know if Ms. Thompson was in school?

10  A.    We didn't discuss school much.

11  Q.    Did you know if she graduated high school?

12  A.    I don't believe that she did, but I don't think we've ever

13  talk about it specifically.

14  Q.    Did you come to know Ms. Thompson in person at all?

15  A.    Yes.  After I got a driver's license.  As it happened, we

16  were both in the local area.

17  Q.    And what did you know about her reputation after getting to

18  know her in person?

19  A.    Paige was a lot of fun to hang out with.  She can be, I

20  would say, energetic, excited, can be the life of the room, also

21  can be quiet.  I don't want to say "meek," but maybe -- maybe

22  shy, something of that sort, small, unpresent.  I would say both

23  sides are present.

24  Q.    Was there a time where Ms. Thompson came to have a

25  different handle or name?

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,           )
                                    ) CASE NO. CR19-00159-RSL
                  Plaintiff,        )
                                    ) Seattle, Washington
v.                                  )
                                    ) June 16, 2022
PAIGE A. THOMPSON,                  ) 9:00 a.m.
                                    )
                  Defendant.        ) JURY TRIAL, Vol. 8 of 9
                                    )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


  For the Plaintiff:        ANDREW C. FRIEDMAN
                            JESSICA M. MANCA
                            TANIA M. CULBERTSON
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        MOHAMMAD ALI HAMOUDI
                            NANCY TENNEY
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101

                            BRIAN E. KLEIN
                            MELISSA A. MEISTER
                            Waymaker LLP
                            515 S Flower Street, Suite 3500
                            Los Angeles, CA 90071


  Reported by:              Nancy L. Bauer, CRR, RPR
                            Marci Chatelain, CRR, RPR, RMP, CCR
                            Official Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov

1    circumvented.

2         And each of the witness companies was asked the question,

3    like the question asked of Mr. Pelaggi:  "Did Apperian intend

4    for her to have access to its code and all of its data?"  And

5    Mr. Pelaggi gave the answer you knew would be the answer:  "We

6    did not, because these were sensitive, they were protected

7    environments."

8         Ms. Thompson didn't get into these environments because she

9    was given permission or because she was authorized.  She got

10   into these environments because she found a novel vulnerability,

11   one that no one else had realized existed, and she exploited

12   that vulnerability.

13        And you know who really knew that Ms. Thompson wasn't

14   authorized to go in there?  Ms. Thompson knew that herself.  She

15   had worked for AWS.  She listed on her resumé -- it was her last

16   job.  One of the proficiencies she lists is IAM, Identity and

17   Access Management.  She knew how the IAM system worked, she knew

18   what roles were, she knew they were not intended for the general

19   public; they were intended for companies to give employees,

20   perhaps to give machines performing processes, but to be given

21   narrowly to people who needed those; not generally available.

22        And Ms. Thompson told you this time and again.  This is a

23   message she sent, a tweet between -- a direct message on Twitter

24   between her and someone else.  She said, "Then I hack into their

25   EC2 instances, assume role their IAM instance profiles, take

Case: 22-30159, 05/20/2023, DktEntry: 34-3, Page 48 of 104
Case 2:19-cr-00159-RSL Document 462 Filed 06/24/22 Page 40 of 47
Government's closing argument                              June 16, 2022          40

1    over their account and corrupt SSM, deploying my back door,

2    mirror their S3 buckets, and convert any snapshots I want to

3    volumes, and mirror the volumes I want via storage gateway."

4         Ms. Thompson isn't saying that she was authorized to go in

5    there, that this was legitimate.  She's saying she hacked her

6    way in there.  And once she got in there, she says she created

7    back doors, ways to have continued access if her other access

8    failed.

9         For this message she sent to someone else, "Yeah, AWS is

10   great, except when someone steals your IAM instance profile that

11   has full access to the account."  She's not saying she is

12   authorized, she's saying she steals.

13        And you don't have to rely just on Ms. Thompson's words.

14   You can look at her actions.  This exhibit, remember, shows her

15   computer setup.  It shows how she communicated.  She had her

16   computer configured so there was a separate virtual computer

17   inside it to communicate with the outside world, to provide

18   additional distance so if somebody traced back, you would get to

19   that computer, you wouldn't figure out what the main computer

20   was.  Then she went through iPredator, which is a VPN, which

21   provides anonymity, and then she went through TOR, in many

22   instances, another way to get anonymity.  Three layers of

23   anonymity.

24        You've heard a lot from defense during the trial.  "Don't

25   people use VPN for legitimate purposes?"  "Don't people use TOR

Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 42 of 47
Case: 22-1930, 04/09/2025, DktEntry: 34.2, Page 42 of 107
Government's closing argument                                        June 16, 2022        42

1          First, it has to prove the defendant knowingly devised and

2   intended to devise the scheme or plan to defraud or to obtain

3   money or property; second, that the statements made as part of

4   the scheme were material.  That is, basically, important;

5          Third, that the defendant acted with the intent to defraud;

6   and fourth, that on or about March 22nd of 2019, the defendant

7   used or caused to be used an interstate wire to carry out an

8   essential part of the scheme.

9          The same evidence about what Ms. Thompson was doing proves

10  each of these elements.  First, was there a scheme or plan?  Did

11  Ms. Thompson devise a scheme or plan to defraud?  And she did,

12  because she devised a scheme to obtain money and property by

13  trickery.  Basically, her scheme was to download valuable data

14  from companies.  Sometimes she might come up empty, she might

15  get a company where the information wasn't particularly useful,

16  sometimes she'd hit a home run.  So it was a scheme to download

17  that property, and it was a scheme to obtain the value of

18  computer processing for cryptojacking.  And it was a scheme that

19  based on trickery and deceit.  It starts with tricking the

20  firewall.  It starts with getting the firewall to pass the

21  message to the Instance Metadata Service, and for the Instance

22  Metadata Service to not understand that it is an external

23  request, and then pass that information back.

24          And Mike Fisk used an interesting word when he testified.

25  He said that she was impersonating the firewall.  That's really

Case: 22-30011 09/15/2023 DktEntry: 23-2 Page: 48 of 107
Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 48 of 104
Government's closing argument                                    June 16, 2022                43

1    what's happening.  The Instance Metadata Service thinks it is
2    responding to a firewall, because Ms. Thompson is impersonating
3    the firewall, and so it provides that information.

4        And once she has the credentials, she uses them to gain the
5    data, to gain access to do the cryptojacking.  And in doing
6    that, in using those credentials, she is representing that she
7    is a person who should have those credentials, that she is a
8    legitimate user of those credentials.  She has to be a
9    legitimate user for that to work, and so she is representing
10   that, and that's the trickery, that's the misrepresentation.

11       Second, that the statements made were material, they were
12   important, and you know they were important.  If the first
13   request to the Instance Metadata Service had said, Hi, I'm an
14   external computer, please provide information, that wouldn't
15   have happened -- well, first, the request wouldn't have been
16   made.  You can't communicate.

17       But second, the Instance Metadata Service would not have
18   answered that.  It would not provide that information to an
19   external source.

20       And second, when Ms. Thompson tried to gain access to the
21   companies' environments, if she was communicating that these
22   credentials are being used by someone who is not a legitimate
23   user, by someone who has stolen these credentials, companies
24   would not provide information to that person.  So these are
25   important misrepresentations.

Case: 22-1036, 07/11/2023, DktEntry: 23.1, Page 62 of 107
Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 62 of 147
Government's closing argument                    June 16, 2022          62

1   and that's as far as you can get from being a white hat hacker.

2       Fundamentally, Ms. Thompson's motivation was not to be a

3   white hat hacker.  It was not to help the companies into which

4   she hacked.  Nothing in the evidence suggests it was.  You

5   haven't seen anything that suggests that benign motive.  What

6   you've seen as evidence is that she wanted data, she wanted

7   money, she wanted to brag.

8       And, in fact, Ms. Thompson didn't just hack herself.  She

9   talked about it with some of her friends.  And this is a message

10  that she sent to a friend.  She had described -- if you go to a

11  little earlier in the chat, she described how to download data,

12  how to scrape S3 buckets and get data from victims, and after

13  doing that, she tells this person, "But, yeah, if you just want

14  to use it to learn how to do some stuff with AWS, go for it.

15  It's not my stuff.  LOL."

16      She's not trying to make things better.  She's trying to

17  make things worse.  She's trying to teach other people how to do

18  what she did.

19      Ladies and gentlemen, all of the evidence in this case

20  shows that Ms. Thompson used her background, she used her

21  knowledge, she used her technological savvy in order to exploit

22  a vulnerability that she figured out.  It was a complicated

23  vulnerability.  No one else had figured it out.  AWS hadn't seen

24  it, so they hadn't figured it out.  No one was aware of it.

25      But Ms. Thompson figured it out, and when she figured it

Case: 22-10312, 07/01/2022, ID: 12478234, DktEntry: 36-2, Page 682 of 1047
Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 68 of 104
Defendant's closing argument                              June 16, 2022        68

1          The next event was that the Instance Metadata Service,

2     please, send me available credentials, and per its rules, it

3     provided role credentials in response to requests from the EC2

4     instances.  "Okay."

5          And the next request, here's a credential, please send me

6     data, launch, and instance.  Capital One configured -- all of

7     these companies configured their computers to allow some or all

8     of these events, allow anyone -- Capital One -- possessing role

9     credentials to read data, launch EC2 instances, or perform other

10    actions for which the role has been granted permission.  That's

11    exactly what happened here.

12         And it is important to understand that Professor

13    Halderman's technical opinions went unchallenged.

14         Instruction 18 to 23, which deal with Counts 2 through 7,

15    all require the government to prove without authorization beyond

16    a reasonable doubt.

17         Professor Halderman's testimony, Mr. Fisk's testimony

18    establish that Ms. Thompson's access to Capital One's computers

19    were authorized.

20         Witness after witness testified that this system was overly

21    permissive.  Overly permissive does not mean without

22    authorization.  It is exactly the opposite; too much

23    authorization.

24         Professor Halderman's conclusions, again, the technical

25    opinions went unchallenged.  Here, all of the companies

Case: 22-10312, 07/20/2022, ID: 12486232, DktEntry: 34-2, Page 43 of 47
Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 69 of 104

Defendant's closing argument                    June 16, 2022          69

1  configured their firewalls, the web application firewall

2  granting overly permissive access to Ms. Thompson, who was able

3  to access the systems for all of these companies from outside

4  their network.  Ms. Thompson had no say over the decisions of

5  these configurations.

6       Now, the companies all had different types of data stored

7  in these S3 buckets.

8       Capital One had 1.7 terabytes of data, some of which was

9  sensitive.

10      Apperian, 700,000 file paths, and inside of them were

11 databases that are of great value to them.

12      Bitglass, internal log files, which, I believe, Mr. Chan

13 testified were not worth anything.

14      42Lines, instance information.

15      Enghouse, survey results.

16      We called two additional entities.  Ohio State said it was

17 public data; Michigan State, public data.

18      The government has made much of the companies' intent here,

19 but, again, their intent is irrelevant.  The concept of "without

20 authorization" does not focus on the company's subjective

21 intent, and the proof here, the only proof here that matters is

22 how the computers were configured at the time of access.

23      Instruction 17, which deals with wire fraud, requires the

24 government to prove beyond a reasonable doubt that there was a

25 misrepresentation of a material fact, and that Ms. Thompson had

Case: 22-30074, 09/13/2022, ID: 12534682, DktEntry: 7-2, Page 44 of 104
Case 2:19-cr-00159-RSL Document 346-2 Filed 06/24/22 Page 45 of 107
Defendant's closing argument                          June 16, 2022          75

1    17th, 2019, Ms. Thompson's access was authorized.

2         On cross-examination, Mr. Fisk admitted that Ms. Thompson

3    was effectively authorized to access their servers and download

4    their data.

5         Initially he said, on direct examination -- or I believe it

6    was cross -- that she stole credentials, stealing credentials.

7    She's not charged with theft.  She's charged with unauthorized

8    access.  And that is why, when I put his own testimony that he

9    gave under oath in a prior proceeding and asked him to answer

10   the question asked in that proceeding, he said -- he testified

11   under oath that she was provided credentials and provided access

12   to data.  And he admitted, following that, that those

13   credentials would be obtained from a public web browser.

14        That evidence is critically important, because not only

15   does it establish that her access was with authorization, but it

16   also establishes, under Instruction 17, Count 1, that this is no

17   false representation of a material fact.

18        The April notification.  Mr. Fisk testified, in April of

19   2019, another Capital One cyber security professional was

20   notified that the system had granted credentials to an external

21   user.  The analyst closed out that notification as well.

22        Professor Halderman agreed, with evidence that he viewed,

23   that this was a loud and proud scan to trigger Capital One's

24   alarms.

25        Intended to notify, technically.  The reason why this is

August 13, 2019

Hon. Michelle L. Peterson
Western District of Washington
United States Courthouse
700 Stewart Street, Suite 12132
Seattle, WA 98101-9906

Re: United States v. Paige A. Thompson, No. MJ19-0344

Dear Judge Peterson:

      I am writing in support of the bail application of the Defendant, Paige
A. Thompson, in the above-referenced matter. I am an attorney and advocate
specializing in the treatment of transgender individuals in confinement settings
and am concerned for Ms. Thompson's safety and well-being should she remain
incarcerated among men in pre-trial custody. As a transgender woman held in a
men's facility, Ms. Thompson faces unique risks to her health and safety while
in custody. These risks are heightened at a pre-trial facility because of the
transient nature of the population, which exposes a young, traditionally
feminine-presenting individual like Ms. Thompson to a particularly high risk of
abuse.

      For the past ten years, the majority of my work has focused on the needs
of transgender prisoners and detainees. I have been a Staff Attorney at the
LGBT & HIV Project of the American Civil Liberties Union (ACLU) since
2013 where I regularly communicate with, advocate on behalf of, and directly
represent transgender individuals incarcerated in prisons and jails across the
country. Prior to that, between 2010 and 2012, I was a Staff Attorney and the
Director of Prisoner Justice Initiatives at the Sylvia Rivera Law Project (SRLP).
As an attorney at SRLP, I represented over 150 transgender individuals and
provided advice and referrals to another 200 transgender individuals involved in
the criminal justice system.

      Through my work at SRLP, and prior to the promulgation of the final
Prison Rape Elimination Act (PREA) regulations in May of 2012, I solicited
comments from over 60 transgender prisoners across New York State on the
Department of Justice's proposed regulations. I also interviewed dozens of
transgender individuals about the unique circumstances they faced while in
custody to inform additional comments on the proposed PREA regulations
concerning transgender prisoners and detainees. I am familiar with the impact of
incarceration on transgender individuals as well as with the legal protections
afforded to transgender prisoners under PREA and the United States
Constitution.

      Research into sexual assault in confinement consistently documents the
heightened vulnerability of transgender women to sexual victimization at the
hands of facility staff and other prisoners in correctional settings.[1] The federal



**ACLU**

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

National Office
125 Broad Street, 18th floor
New York NY 10004
(212) 549-2500
aclu.org

---

[1] See, e.g., National Prison Rape Elimination Commission Report 73 (June 2009); A. Beck et
al., Sexual Victimization in Jails and Prisons Reported by Inmates, 2008-09 at 14-15 (Bureau

government has recognized this vulnerability of transgender individuals. In 2009, pursuant to PREA, Congress convened the National Prison Rape Elimination Commission (NPREC), which released a 250-page report detailing the epidemic of sexual violence in custody. Recommending an end to placement decisions based on assigned sex at birth, the report emphasized that "most male-to-female transgender individuals who are incarcerated are placed in men's prisons, even if they have undergone surgery or hormone therapies to develop overtly feminine traits[, and t]heir obvious gender nonconformity puts them at extremely high risk for abuse."[2] Like those individuals identified in the NPREC report, Ms. Thompson faces an exceedingly high risk of sexual abuse and harassment while in custody.



Since the United States Supreme Court decided the seminal case of *Farmer v. Brennan*, 511 U.S. 825 (1994), twenty-five years ago, courts have also found that transgender women incarcerated in men's prisons remain among the most vulnerable class of prisoners. *See, e.g.*, Greene v. Bowles, 361 F.3d 290, 293-94 (6th Cir. 2004) (finding a transgender woman prisoner in a men's facility was vulnerable to both physical and sexual attacks); *R.W. v. United States*, 958 A.2d 259, 267 (D.C. 2008) (affirming lengthy sentence where a former prison guard sexually assaulted a transgender inmate and finding that the "sentence was intended to reflect his victim's particular vulnerability as a transgender inmate in an all-male prison unit"); *Green v. Hooks*, No. 6:13–cv–17, 2013 WL 4647493, at *4 (S.D. Ga. Aug. 29, 2013) (denying qualified immunity to officials in Eighth Amendment case of a transgender woman in a men's prison who was assaulted by a male prisoner).

Though all confinement poses these risks, a pre-trial facility poses particularly high risks. Whereas upon sentencing, Ms. Thompson could potentially be sent to a facility with the capacity to set up a system to protect her from abuse in the least restrictive setting, at a pre-trial facility the population is transient and any security is short-lived and disrupted by the regular influx of new detainees. For Ms. Thompson, a transgender woman who stands out among the male population, this also means that she has to regularly adapt to manage the inevitable threats to her bodily safety. This level of vigilance can only be sustained for so long before her health will deteriorate. The solution to this vulnerability is not protective custody, which will only increase her risk of assault and further jeopardize her health.

Often transgender individuals are placed in solitary confinement or other forms of segregation to protect them from the undeniably high risks of abuse they face in general population, but these measures cause significant harm themselves. As far back as the 1960s, studies of solitary confinement reported

---

of Justice Statistics Aug. 2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf; V. Jenness et al., Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault (Ctr. for Evidence-Based Corrs. 2009).

[2] National Prison Rape Elimination Commission Report at 74, *available at* https://www.ncjrs.gov/pdffiles1/226680.pdf.

observable negative effects among prisoners subjected to such conditions.[3] As
one prison staff psychiatrist stated in 2002, "[i]t's a standard psychiatric
concept, if you put people in isolation, they will go insane… Most people in
isolation will fall apart."[4] Additionally, isolation can cut transgender prisoners
off from their limited support systems inside the facility, which can expose them
to further abuse while in segregation.

The conditions that many transgender women face in prison result in
lifelong trauma, adverse health consequences, and at times, death. I have
witnessed first-hand the distress that transgender individuals endure when they
are singled out for abuse in custody because of their gender. Too many end up
being abused or engaging in self-harm in the midst of trauma and emotional
crisis. I am concerned for Ms. Thompson's continued incarceration in a men's
unit and support her application for bail in this matter. Seattle has resources to
support transgender defendants, ensure they make it to court, and find health
and healing in the process.

I respectfully urge the Court to consider bail for Ms. Thompson.

Very truly yours,

Chase Strangio, Esq.

ACLU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

---

[3] *See* Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, 11 CANADIAN
PSYCHIATRIC ASS'N J. 470-484 (1966); Hans Toch, *Men in Crisis: Human Breakdowns in
Prison* (1975); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A
Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC.
CHANGE 477 (1997).

[4] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 149 &
n.512 (2003), available at goo.gl/ZxgPRB (emphasis omitted) (last viewed Dec. 18, 2017).